In re GRAND EAGLE COMPANIES, INC., Debtor.

Official Committee of Unsecured Creditors, Plaintiffs,

v.

Asea Brown Boveri, Inc., et al., Defendants.

Bankruptcy No. 01–54821. Adversary No. 02–5090.

United States Bankruptcy Court, N.D. Ohio, Eastern Division.

Jan. 14, 2003.

Joseph Hutchinson, Marc Merklin, Brouse McDowell, Cleveland, OH, for Plaintiff.

Miranda Schiller, Weil, Gotshal & Manges, LLP, New York City, Jeffrey Levinson, Margulies & Levinson, LLP, Cleveland, OH, for Ddefendant-Prudential.

Chris Landgraff, J.B. Heaton, Bartlit Beck Herman Palenchar & Scott, Chicago, IL, Christopher Meyer, Patrick Brooks, Squire, Sanders & Dempsey, Cleveland, OH, for Defendant–ABB.

## MEMORANDUM OPINION RE: MOTIONS TO DISMISS

MARILYN SHEA–STONUM, Bankruptcy Judge.

This matter comes before the Court on the following pleadings: (1) a "First Amended Complaint" filed by the Official Committee of Unsecured Creditors of Grand Eagle Companies, Inc. (the "Committee") on July 11, 2002 [docket # 23] (the "Amended Complaint"); (2) a "Motion to Dismiss Plaintiff's Amended Complaint" filed by defendant, ASEA Brown Boveri, Inc. ("ABB") on July 24, 2002 [docket # 30]; (3) a "Memorandum in Support of its Motion to Dismiss Plaintiff's Amended Complaint" filed by ABB on July 24, 2002 [docket # 31]; (4) a "Motion to Dismiss the Complaint Pursuant to F.R.C.P. 12(b)(6) and 9(b)" filed by defendant, The Prudential Insurance Company of America ("Prudential") on August 19, 2002 [docket # 35]; (5) an "Affidavit of Jeffrey M. Levinson" in support of Prudential's motion to dismiss filed on August 19, 2002 [docket # 36]; (6) a "Consolidated Memorandum in Response to Prudential Insurance Company of America's and ASEA Brown Boveri, Inc.'s Motions to Dismiss Amended Complaint" filed by the Committee on September 13, 2002 [docket # 42]; (7) a "Reply Memorandum in Support of its Motion to Dismiss Plaintiff's Amended Complaint" filed by ABB on September 27, 2002 [docket # 44] and (8) a "Reply Memorandum of Law in Support of Motion to Dismiss" filed by Prudential on September 27, 2002 [docket # 45]. This proceeding arises in a case referred to this Court by the Standing Order of Reference entered in this District on July 16, 1984. It is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (F), (H) and (O) over which this Court has jurisdiction pursuant to 28 U.S.C. § 1334(b). To the extent that any of the issues raised in the Amended Complaint and the motions to dismiss filed by ABB and Prudential are not core proceedings, counsel for those parties, during an August 30, 2002 pre-trial conference, expressed consent to this Court entering

final judgment on the motions to dismiss. 28 U.S.C. § 157(c)(1) and (2).

## MOTION TO DISMISS STANDARD OF REVIEW

When considering a motion to dismiss pursuant to FED. R. BANKR. P. 7012(b) and FED. R. CIV. P. 12(b)(6), a court must accept all well-pleaded factual averments as true, and draw all reasonable inferences therefrom in plaintiff's favor. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The issue to be decided is not whether plaintiff will ultimately prevail but whether plaintiff is entitled to offer evidence to support the claims stated in its complaint. *Id.* Thus, a motion to dismiss for failure to state a claim will not be granted unless it appears *beyond doubt* that plaintiff can prove no set of facts in support of its claim which would entitle it to relief. *Id.*

## THE DEFENDANTS

In its Amended Complaint the Committee names 16 defendants including ABB and Prudential. Prudential is included in a group of defendants who are collectively referred to in the Amended Complaint as the "Bank Defendants."[1] Also named as defendants in the Amended Complaint are six partnership entities and three individuals who are collectively referred to as the "Former Shareholders."[2]

## BACKGROUND

On December 7, 2001 (the "Petition Date"), Grand Eagle Companies, Inc. ("Grand Eagle") and 5 of its wholly owned subsidiaries (the "Subsidiaries")[3] filed voluntary chapter 11 bankruptcy petitions. The chapter 11 cases of the Subsidiaries are being jointly administered with the chapter 11 case of Grand Eagle. As of the Petition Date, Grand Eagle and the Subsidiaries claimed to be North America's largest independent supplier of comprehensive motor, breaker and transformer services.

In the Amended Complaint the Committee outlines two complex pre-petition financial transactions (one in April 2000 and one in June 2001) which, it alleges, form the bases for the claims raised therein. It appears that the April 2000 transaction consisted of a series of separate transactions which closed simultaneously. The Committee alleges that these separate transactions should be viewed as a single integrated transaction because they "were mutually conditioned on each other and were entered into by the respective parties thereto with full knowledge of the other transactions." [Am. Compl. ¶ 58]. In short, what the Committee describes in the Amended Complaint is a scenario in which new investors acquired the controlling interest in six operating entities for $27,500,000, while the old shareholders of those same entities received a total of approximately $58,000,000 for their ownership interests. There does not appear to have been accumulated capital in the purchased entities to account for the

---

1. The "Bank Defendants" are comprised of the following: Credit Agricole Indosuez; Key Corporate Capital, Inc; La Salle Bank, N.A.; Indosuez Capital Funding VI, Limited; Rob-Wal Investment Co. and Prudential.

2. The "Former Shareholders" are comprised of the following: Keystone Venture IV, L.P.; Inroads Capital Partners; The Blue Chip Opportunity Fund Limited Partnership; The Blue Chip Capital Fund, L.P.; Grand Eagle Associates, L.P.; Grand Eagle Associates II, L.P.; Jerry O. Williams; William R. Givens and Richard B. Black.

3. Those subsidiaries are: Grand Eagle Services, Inc. (f.k.a. ABB Services, Inc.); Grand Eagle Distribution, Inc.; Grand Eagle Services North America, Inc.; Ohio Transformer, Inc.; and North American Coil Corporation.

$30,500,000 delta between what the old shareholders demanded for those assets and what the new investors were willing to pay.

What follows is this Court's understanding of the relevant allegations in the Amended Complaint, organized in a manner which permits analysis of the pending motions.

### Grand Eagle's Pre–Transaction Composition and Financial Posture

1. Prior to the April 2000 transaction, Grand Eagle owned the following subsidiaries: (a) Grand Eagle Distribution, Inc.; (b) Grand Eagle Services North America, Inc.; (c) Ohio Transformer, Inc. and (d) North American Coil Corporation (collectively, the "Pre–Transaction Subsidiaries"). [Am. Compl. ¶¶ 11–15, 49].

2. Prior to the April 2000 transaction, Grand Eagle and the Pre–Transaction Subsidiaries were obligated for approximately $41,600,000 of indebtedness pursuant to the following:

   (a) an unsecured $17,500,000 term loan from Prudential;

   (b) an unsecured and subordinated $15,000,000 loan from Prudential; and

   (c) a revolving credit facility from La Salle Bank, N.A. with an outstanding balance of approximately $9,100,000.

[Am. Compl. ¶ 57].

3. Prior to the April 2000 transaction, the Former Shareholders controlled Grand Eagle and the Pre–Transaction Subsidiaries. [Am. Compl. ¶ 66].

### The April 2000 Transaction

4. Pursuant to a stock purchase agreement Grand Eagle acquired a 100% equity interest in ABB Services, Inc. (n/k/a Grand Eagle Services, Inc.) from ABB in exchange for $42,215,000 in cash. [Am. Compl. ¶ 49].

5. Pursuant to a different stock purchase agreement the Former Shareholders transferred 175,000 shares of Grand Eagle common stock, 1,693,085 shares of Grand Eagle series I preferred stock and 147,794 shares of Grand Eagle series II preferred stock to Private Equity Investors IV, L.P. in exchange for $15,750,000 in cash. [Am. Compl. ¶ 44].

6. Thereafter, Private Equity Investors IV, L.P. contributed $10,750,000 to Grand Eagle in exchange for an additional 1,375,-917 shares of newly issued Grand Eagle common stock. [Am. Compl. ¶ 45].

7. Immediately thereafter, Private Equity Investors IV, L.P. exchanged all of its newly acquired Grand Eagle stock (both common and preferred) for 3,391,796 shares of Grand Eagle common stock. [Am. Compl. ¶ 46].

8. Pursuant to a transaction agreement Indosuez Capital Co–Invest Partners[4] contributed $1,000,000 to Grand Eagle in exchange for 127,992 shares of Grand Eagle common stock. [Am. Compl. ¶ 47].

9. At the conclusion of these transactions no Grand Eagle preferred stock remained outstanding and Private Equity Investors IV, L.P. owned approximately 96% of Grand Eagle's outstanding common stock. [Am. Compl. ¶ 48].

10. In order to fund the payments to ABB and the Former Shareholders, Grand

---

4. The Committee alleges that Indosuez Capital Co–Invest Partners is a distinct entity from but somehow affiliated with named defendants Indosuez Capital Funding VI, Limited and Credit Agricole Indosuez. [Am. Compl. ¶ 47]. Capital Co–Invest Partners is not a named defendant in this action.

Eagle arranged a new credit facility (the "Bank Financing"). [Am. Compl. ¶ 51].

11. The Bank Financing consisted of three term loans totaling $62,500,000 and a revolving loan with a maximum limit of $15,000,000 (the "Revolver"). [Am. Compl. ¶ 52].

12. Defendant, Credit Agricole Indosuez, served as agent for a syndicate of lending institutions and as a lender itself in connection with the Bank Financing. [Am. Compl. ¶ 52].

13. The Bank Financing was secured by security interests in Grand Eagle's personal property and by mortgages on Grand Eagle's real property. The Bank Financing was also unconditionally guaranteed by each of the Subsidiaries and those guarantee obligations were secured by security interests and mortgages in the Subsidiaries' personal and real property. [Am. Compl. ¶ 53].

14. As part of the April 2000 transaction Prudential's $17,500,000 note was satisfied and replaced with a new $17,500,000 term loan as an original lender with Credit Agricole Indosuez serving as agent. Prudential's $15,000,000 subordinated note was also satisfied and replaced with a new $15,000,000 subordinated note. [Am. Compl. ¶¶ 55–57].

15. The pre-transaction loan from La Salle Bank, N.A. was also satisfied and replaced as part of the April 2000 transaction. [Am. Compl. ¶ 57, ¶ 60].

16. After the April 2000 transaction, the financial obligations of Grand Eagle and the Subsidiaries increased to $77,500,000 (excluding the Revolver) as follows:

(a) $25,000,000 term loan owed to Credit Agricole Indosuez;

(b) $12,500,000 term loan owed to Key Corporate Capital, Inc.;

(c) $7,500,000 term loan owed to La Salle Bank, N.A.;

(d) $17,500,000 term loan owed to Prudential;

(e) $15,000,000 subordinated loan owed to Prudential.

[Am. Compl. ¶ 57].[5]

17. Shortly after the closing of the April 2000 transaction Grand Eagle and the Subsidiaries drew on the Revolver thus increasing their financial obligations under the Bank Financing to $92,500,000. [Am. Compl. ¶ 72].

18. The April 2000 transaction was funded with $105,000,000 in combined proceeds consisting of the following: (a) $77,500,000 from the Bank Financing and (b) $27,500,000 in equity contributions made by Private Equity Investors IV, L.P. and Capital Co–Invest Partners. These proceeds were used as follows:

(a) $42,215,000 was distributed to ABB in exchange for Grand Eagle's acquisition of a 100% equity interest in ABB Services, Inc.;

(b) $15,750,000 was distributed to the Former Shareholders in exchange for Private Equity Investors IV, L.P.'s acquisition of their stock in Grand Eagle;

(c) the $15,000,000 subordinated loan from Prudential was reaffirmed on modified terms;

(d) approximately $26,600,000 was used to retire pre-existing debt including $9,100,000 owed to LaSalle Bank,

**5.** On the closing date of the April 2000 transaction Credit Agricole Indosuez held as lender $45,000,000 of the terms loans and the entire $15,000,000 revolver included in the Bank Financing. On or about May 9, 2000, Creditor Agricole Indosuez's portion of the Bank Financing was assigned to the entities here listed. [Am. Compl. ¶ 54].

N.A. and $17,500,000 owed to Prudential;

(e) approximately $5,100,000 was used to pay bank and professional fees incurred in connection with the April 2000 transaction; and

(f) $314,000 in remaining cash was reserved for use by Grand Eagle.

[Am. Compl. ¶¶ 59, 60].[6]

### Assets and Earnings of Grand Eagle and the Subsidiaries

19. Grand Eagle and the Pre-Transaction Subsidiaries operated on a fiscal year which ended on June 30. [Am. Compl. ¶¶ 61, 65].

20. Private Equity Investors IV, L.P. and the Bank Defendants were provided with financial projections showing that Grand Eagle and the Subsidiaries would have yearly combined revenue of approximately $228,000,000 and yearly combined EBITDA[7] of approximately $22,000,000 for the fiscal year ending June 30, 2000. [Am. Compl. ¶ 61].

21. The parties taking part in the April 2000 transaction used a multiple of 4.8 times earnings to project the value of Grand Eagle and the Subsidiaries for purposes of offering collateral to the Bank Defendants. Since those parties used a projected EBITDA of $22,000,000 for the fiscal year ending June 30, 2000, that value was set at $105,000,000 ($22,000,000 × 4.8). [Am. Compl. ¶ 65].

22. As of June 30, 2000 (which was only 11 weeks after closing of the April 2000 transaction), the combined annual revenue of Grand Eagle and the Subsidiaries was approximately $183,000,000 and its actual EBITDA was $11,599,000. [Am. Compl. ¶ 63].

23. If a 4.8 multiplier had been applied to the actual June 30, 2000 EBITDA, the value of Grand Eagle and the Subsidiaries would have been calculated at $55,680,000 which is significantly less than the financial obligations those entities incurred as a result of the April 2000 transaction. [Am. Compl. ¶ 65].

### The June 2001 Restructuring

24. In June 2001 the Bank Defendants refinanced the Bank Financing and converted more than $30,000,000 into equity. [Am. Compl. ¶ 73].

25. The Bank Defendants received, in the aggregate, all of Grand Eagle's new preferred stock and 39% of new common stock on a fully diluted basis. Prudential received the largest block of the Bank Defendants' new equity: one third of the outstanding class A (voting) common stock, which constituted 25% of Grand Eagle's new common stock on a fully diluted basis. [Am. Compl. ¶ 73].

26. As part of the June 2001 restructuring the Subsidiaries' guarantees were all reaffirmed and the original security agreement was amended to secure the new credit facility. [Am. Compl. ¶ 74].

27. Given the Bank Defendants' acquisition of an equity interest in Grand Eagle, the near total equity ownership that Private Equity Investors IV, L.P. had in Grand Eagle after the April 2000 transaction was significantly reduced. Pursuant to the June 2001 restructuring, Private Equity Investors IV, L.P. was left with two-thirds of Grand Eagle's class A (vot-

---

**6.** In adding the numbers provided by the Committee there appears to be $11,000 of the $105,000,000 proceeds from the Bank Financing that are not accounted for.

**7.** The Committee did not define the term "EBITDA" in the Amended Complaint. The Court is assuming that the Committee is using this term to describe earnings before income, taxes, deductions and amortization.

ing) common stock, which equaled 51% of all classes of Grand Eagle's common stock on a fully diluted basis. [Am. Compl. ¶ 75].

28. The purpose of the June 2001 restructuring was to keep Grand Eagle and the Subsidiaries in business and to avoid an immediate shut down of operations to enable the Bank Defendants to sell Grand Eagle and the Subsidiaries as a going concern. [Am. Compl. ¶ 77].

### ABB'S MOTION TO DISMISS

The Amended Complaint sets forth several causes of action against ABB regarding transfers to ABB in connection with the April 2000 transaction. Two of those causes of action [counts 1 and 10] allege that the transfers to ABB were fraudulent pursuant to § 544(b) of the Bankruptcy Code and related Ohio and Illinois law. [Am. Compl. ¶¶ 78–80 and ¶¶ 110–114]. The Committee also contends [count 4] that the transfers to ABB constituted, in whole or in part, corporate dividends from ABB Services, Inc. to ABB and that such dividends were illegal under Delaware General Corporation Law. [Am. Compl. ¶¶ 87–89]. Another cause of action raised against ABB [count 5] alleges that the transfers to ABB in connection with the April 2000 transaction constituted a redemption of stock by ABB Services Inc. and that such redemption was prohibited by Delaware law. [Am. Compl. ¶¶ 90–92].[8]

#### *Application of 11 U.S.C. § 546(e)*

■ ABB contends that all claims asserted against it are barred by § 546(e) of the Bankruptcy Code which provides in pertinent part:

Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

ABB argues that the payment made to it through the April 2000 transaction is a "settlement payment" that was "made by or to a financial institution" and that, as a matter of law, such payment is beyond challenge in Grand Eagle's bankruptcy. The Committee argues that ABB's interpretation of § 546(e) is overly broad because that provision was enacted to protect public confidence in the securities trade by prohibiting avoidance of payments necessary to settle transfers of publicly traded stock. Because the transfer at issue here involved only privately held stock, the Committee contends that § 546(e) does not apply.

■ Section 546(e) applies to "settlement payments" as that term is defined in § 741(8) of the Bankruptcy Code which provides as follows:

"settlement payment" means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade.

---

8. The Committee also alleges [count 13] that, as to *all* defendants, "[t]he receipt by any Defendant of any transfer of property from Grand Eagle or the Subsidiaries that is avoidable as described herein and has not been returned by or received from such Defendant entitles the Plaintiff, on behalf of the Debtors and their creditors, to an order disallowing any claims asserted by such Defendants against Debtors pursuant to Section 502(d) of the Bankruptcy Code." [Am. Compl. ¶ 126].

The reflexive aspect of this provision, i.e., defining the meaning of "settlement payment" by listing a variety of types of "settlement payments," requires the reader to consider extrinsic information and the final modifying phrase "or any other similar payment commonly used in the securities trade" is key to the intended meaning and use of that term.[9] Where Congress has used technical words or terms of art, reference must be made to the art or science (or in this case industry) in which the term was used at the time of the enactment of the statute. *McDermott Int'l, Inc. v. Wilander,* 498 U.S. 337, 342, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991); *Corning Glass Works v. Brennan,* 417 U.S. 188, 201–02, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974).

The following background information regarding how the securities industry operates was set forth by the Tenth Circuit Court of Appeals in *Kaiser Steel Corp. v. Pearl Brewing Co. (In re Kaiser Steel Corp.),* 952 F.2d 1230 (10th Cir.1991). In that case the Tenth Circuit was presented with the question of whether consideration paid to shareholders of a publicly traded company for their stock in connection with a leveraged buy out was exempt from the avoiding powers of a trustee under § 546(e) of the Bankruptcy Code as "settlement payments." In rendering its decision, the Tenth Circuit had the benefit of written pleadings and oral argument from the Securities and Exchange Commission which was acting as a special advisor to the courts. *Id.* at 1235 n. 1.

With respect to the routine purchase and sale of a security, there are at least two opportunities for "settlement." The first ("street-side settlement") takes place between the brokers and the clearing agency during the process of clearance and settlement. The brokers submit their transactions which are matched and compared. Confirmed contracts are submitted to the clearing agency's accounting functions, and the obligations created under the separate trades are netted to arrive at each clearing member's "settlement obligations." On the "settlement date" (normally five days after the trade date) the brokers and the clearing agency, which has interposed itself between the selling broker and the buying broker, will deliver securities and receive payment. *See* Division of Market Regulation, Securities and Exchange Commission, *The October 1987 Market Break* at 10–5 (*SEC Report*); Dale A. Oesterle, *Comment on the Harris Paper,* 74 Cornell L.Rev. 943, 944 (1989) ("Settlement payments refer to the final payment of funds between clearing house [members] for trade[s] registered up to a specific point in time.").

In addition, a "customer-side settlement" also occurs between the broker and its customer. *See SEC Report* at 10–2, 10–10 to 10–11; New York Stock Exchange, *Language of Investing Glossary* 30 (1981) (defining settlement as "[c]onclusion of a securities transaction when a customer pays broker/dealer for securities purchased or delivers securities sold and receives from the broker the proceeds of a sale"); J. Low, *The Investor's Dictionary,* 169 (1964) ("Settlement day is the day by which a buyer of securities must pay his broker for his purchases and a seller must deliver to his broker negotiable certificates for any securities sold."). Logically, the term "settlement payment" may also be used to describe payments made to settle a

---

**9.** Some courts, in interpreting § 546(e), have determined that the definition of "settlement payment" in § 741(8) is ambiguous. *See, e.g., Zahn v. Yucaipa Capital Fund,* 218 B.R. 656, 675 (D.R.I.1998) ("[t]his definition defies plain meaning").

customer's account with its broker. *Cf.1981 Hearings* at 294 (Statement by Jack Nelson, President, National Securities Clearing Corporation) ("Prior to the Code, the securities industry knew for certain that margin, mark-to-market, deposit and settlement payments made by a securities customer or broker to a clearing broker or a clearing agency ... could not be voided"); *id.* at 492 (Statement by Securities Industry Association) (referring to the "traditional right of brokers and their clearing agencies to close out the accounts of insolvent brokers and customers to retain margin, mark-to-market and settlement payments").

*Kaiser Steel Corp. v. Pearl Brewing Co. (In re Kaiser Steel Corp.)*, 952 F.2d 1230, 1237–38 (10th Cir.1991). The Tenth Circuit also noted the following in regards to the "settlement" system used in the securities industry:

> Under this system there are also at least two corresponding sets of guarantees. The brokers guarantee that they will perform even if their customers fail to perform, and the clearing agency guarantees to perform even if individual clearing members fail to perform. Prior to settlement, these guarantees subject the brokers and the clearing agency to a potential risk of loss, should a selling party be forced to cover the obligations of a defaulting customer or clearing member in a rising market (i.e., buy

securities that cost more than the party will receive), or should a buying party be forced to buy securities in a failing market (i.e., pay more for securities than their present market value). To reduce this risk, in a fluctuating market, the clearing agency may demand certain types of "margin payments" from its clearing members, and a broker may be required to demand similar types of payments from its customers. These payments, like settlement payments, are protected under § 546(e).

*Id.* at 1237 n. 4.

Congress first enacted § 546 of the Bankruptcy Code in 1978 and when enacted, it applied only to commodities markets. *Kaiser Steel Corp. v. Charles Schwab & Co., Inc.*, 913 F.2d 846, 848–49 (10th Cir. 1990), *citing* 11 U.S.C. § 764(c) (repealed 1982).[10] By enacting that provision Congress sought to "promote customer confidence in commodity markets generally" through "the protection of commodity market stability." *Id.* at 849, *citing* S.Rep. No. 989, 95th Cong., 2d Sess. 8 (1978).[11] In 1982 Congress replaced § 764(c) with § 546(e) and § 741(5) and (8) "to clarify and, in some instances, broaden the commodities market protections and expressly extend similar protections to the securities market." *Kaiser Steel Corp. v. Charles Schwab & Co., Inc.*, 913 F.2d 846, 849 (10th Cir.1990), *citing* H.R.Rep. No. 420, 97th Cong., 2d Sess. 2 (1982). Congress's purpose in enacting this new provision was

---

**10.** Section 764(c) of the Bankruptcy Code provided as follows:

> (c) Notwithstanding sections 544, 545, 547, 548, and 724(a) of this title, the trustee may not avoid a transfer that is a margin payment to or deposit with a commodity broker or forward contract merchant or is a settlement payment made by a clearing organization and that occurs before the commencement of the case, except under section 548(a)(1) of this title.

COLLIER ON BANKRUPTCY App. Pt. 4(a), § 764(c) (Lawrence P. King ed., 15th ed.2001).

**11.** Commodities markets were singled out by Congress as a response to the decision in *Seligson v. New York Produce Exchange*, 394 F.Supp. 125 (S.D.N.Y.1975) that a trustee could recover a margin payment made to a commodities clearinghouse. *Kaiser Steel Corp. v. Charles Schwab & Co., Inc.*, 913 F.2d 846, 849 n. 4 (10th Cir.1990).

"to minimize the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries." *Kaiser Steel Corp. v. Charles Schwab & Co., Inc.,* 913 F.2d 846, 849 (10th Cir.1990), *citing* H.R.Rep. No. 420, 97th Cong., 2d Sess. 1 (1982).

Against this backdrop, the protection of § 546(e) has been applied to the purchase and sale of stock of publicly traded companies. *(In re Resorts Int'l, Inc.),* 181 F.3d 505 (3rd Cir.1999); *Kaiser Steel Corp. v. Pearl Brewing Co. (In re Kaiser Steel Corp.),* 952 F.2d 1230 (10th Cir.1991); *Official Comm. of Unsec. Creditors v. Fleet Retail Fin. Group (In re Hechinger Invest. Co. of Delaware),* 274 B.R. 71 (D.Del. 2002).[12] In so doing, the intent of Congress to promote stable financial markets is achieved. However, against this same backdrop, it is unlikely that Congress intended the term "settlement payment" to encompass the payment made to ABB in the April 2000 transaction.

As noted above, Grand Eagle acquired a 100% equity interest in ABB Services, Inc. from ABB in exchange for $42,215,000 in cash which Grand Eagle obtained through the Bank Financing. Notwithstanding the fact that the transaction involved only two private parties, ABB contends that § 546(e) applies because a "settlement payment" is simply "the transfer of cash made to complete a securities transaction" and the cash that ABB ultimately received

came from a financial institution and not from Grand Eagle itself. [ABB Mem. Supp. Mot. Dismiss pg. 5]. Such a simplistic reading of § 546(e) ignores the meaning of the term "settlement payment" within the securities industry and would, essentially, convert that statutory provision into a blanket transactional cleansing mechanism for any entity savvy enough to funnel payments for the purchase and sale of privately held stock through a financial institution. *Cf. Zahn v. Yucaipa Capital Fund,* 218 B.R. 656 (D.R.I.1998) (holding that § 546(e) did not apply to the sale of non-publicly traded stocks because the stock transfers had no connection with the clearance and settlement system and allowing avoidance would have no impact upon such system); *Jewel Recovery, L.P. v. Gordon,* 196 B.R. 348 (N.D.Tex.1996) (holding that § 546(e) did not apply to a strictly private stock transaction that did not implicate the clearance and settlement process) [13]; *Wieboldt Stores, Inc. v. Schottenstein,* 131 B.R. 655 (N.D.Ill.1991) (holding that § 546(e) would not preclude the chapter 11 trustee from avoiding various pre-petition stock transfers because the undoing of such transactions posed no significant threat to the clearance and settlement chain).

Based upon the foregoing the Court finds that § 546(e) of the Bankruptcy Code does not preclude the Committee from challenging the payments made to ABB in connection with the April 2000 transaction.

---

**12.** *But see Munford v. Valuation Research Corp. (In re Munford, Inc.),* 98 F.3d 604 (11th Cir.1996) (holding that § 546(e) of the Bankruptcy Code did not prevent a chapter 11 trustee from avoiding pre-petition leverage buyout payments made to a publically-traded debtor's shareholders regardless of whether they were "settlement payments" because the shareholders were not among enumerated, protected entities even though a bank (which is a protected entity) was involved in the transaction as the bank was merely a conduit and never acquired beneficial interest in ei-

ther the funds or shares to qualify it as a "transferee" for avoidance purposes).

**13.** In this case, the court recognized that "[t]he affirmative application of § 546(e) to this transaction would serve to sanction the practice of structuring private stock purchases in an effort to circumvent the avoidance section, merely by utilizing a financial institution." *Jewel Recovery, L.P. v. Gordon,* 196 B.R. 348, 353 (N.D.Tex.1996).

At best, that statutory provision provides ABB with an affirmative defense that it may assert should the Committee prevail on the claims it has raised against ABB. However, at this stage of the litigation, ABB will not be permitted to merely cite to that technically drafted statutory protection mechanism to summarily defeat the Committee's claims.

### Failure to Properly Allege Cause of Action Based upon Fraud

■ ABB also contends that the Committee's causes of action based upon § 544(b) of the Bankruptcy Code were not pled with required particularity and that such claims must, therefore, be dismissed. Rule 9(b) of the Federal Rules of Civil Procedure, which applies to bankruptcy proceedings pursuant to Bankruptcy Rule 7009, provides that "[i]n all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity." Fed. R. Bankr. P. 7009; Fed. R. Civ. P. 9(b). The purpose of the rule is to provide defendants with fair notice of the substance of a plaintiff's claim in order that a defendant may adequately prepare a responsive pleading. *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (6th Cir.1988). It also serves to protect a defendant whose reputation may be harmed by meritless claims of fraud as well as to discourage "strike suits." [14] *Segal v. Gordon*, 467 F.2d 602, 607 (2nd Cir.1972).

■ The Rule 9(b) pleading requirements are to be construed liberally given the provisions of Rule 8 which requires only a "short and plain statement of the claim." Fed. R. Bankr. P. 7008(a); Fed. R. Civ. P. 8(a); *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (6th Cir.1988). Moreover, less stringent pleading requirements are imposed in bankruptcy proceedings when the plaintiff is a third party outsider to the allegedly fraudulent transaction which, initially, has only second hand information upon which to rely in framing issues. *Barr v. Charterhouse Group Int'l, Inc. (In re Everfresh Beverages, Inc.)*, 238 B.R. 558, 581 (Bankr. S.D.N.Y.1999); *Profilet v. Cambridge Fin. Corp.*, 231 B.R. 373, 379 (S.D.Fla.1999); *Bell v. Collins (In re Collins)*, 137 B.R. 754, 755–56 (Bankr.E.D.Ark.1992); *Birnberg v. Rancho La Costa, Inc. (In re Reach McClinton & Co., Inc.)*, 62 B.R. 978, 982–83 (Bankr.D.N.J.1986).[15]

■ The Committee is alleging that the transfer of proceeds from Grand Eagle to ABB through the April 2000 transaction can be avoided pursuant to § 544(b) of the Bankruptcy Code and applicable state law. The applicable state law that the Committee is relying upon provides that a transfer is constructively fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer without receiving

---

**14.** A "strike suit" is a "[s]hareholder derivative action begun with hope of winning large attorney fees or private settlements, and with no intention of benefitting the corporation on behalf of which suit is theoretically brought." Black's Law Dictionary 1423 (6th ed.1990).

**15.** Concerns regarding the specificity requirement of Rule 9(b) as applied to a third party outsider have been addressed by Professors Wright and Miller:

The sufficiency of a particular pleading under Rule 9(b) depends upon a number of variables.... When the pleader is asserting that third persons have been defrauded, he may be unable to detail the claim and less particularity should be required. Thus, simple allegations should suffice for claims of fraud in an informer's action or a derivative suit and primary reliance should be placed on the discovery process for uncovering factual details.

5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1298 (2d ed.2002).

a reasonably equivalent value in exchange for the transfer and if the debtor:

(1) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(2) intended to incur, or believed or reasonably should have believed that it would incur, debtor beyond its ability to pay as they became due.

OHIO REV. CODE ANN. § 1336.04 (Anderson 1993); 740 ILL. COMP. STAT. ANN. 160/8 (West 2002).[16]

Although in some instances only general, the Committee does set forth allegations in the Amended Complaint meeting all the elements of a constructive fraud claim under the applicable Ohio and Illinois statutes. [Am. Compl. ¶¶ 4, 5, 7, 8, 61, 62 and 68–70]. The Amended Complaint also includes some more specific allegations such as that the Former Shareholders controlled Grand Eagle and the Pre–Transaction Subsidiaries immediately before the April 2000 transaction and that shortly after the transaction closed the actual financial posture of Grand Eagle and the Subsidiaries was much different than the projected financials which defendants used to value the challenged transaction. [Am. Compl. ¶¶ 63, 65, 66].

ABB contends that these allegations do not satisfy the pleading requirements of Rule 9(b) because the Committee has failed to set forth specific allegations of fact to support its fraud claim.[17] This, of course, begs the question of how, without discovery, the Committee would be privy to such facts.[18] Given the Committee's outsider status relative to the challenged

---

16. Both of these statutory provisions also address avoidance actions on the basis of actual fraud which the Committee is not alleging in the Amended Complaint. Some courts have held that a claim for a constructively fraudulent conveyance has nothing to do with fraud so that Rule 9(b)'s pleading requirements are not applicable to such claims. *See, e.g., Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.)*, 281 B.R. 506, 518 (Bankr.E.D.N.Y.2002).

17. All of the cases that ABB cited to in support of this contention deal with situations in which the party alleging fraud was directly involved with the allegedly fraudulent activity and not, as in the situation at bar, where the party alleging fraud is an outsider.

18. Given the chapter 11 trustee's indication that he did not intend to pursue any avoidance actions on behalf of the estate the Committee initiated this adversary proceeding. The filing of this adversary proceeding less than three months after the Petition Date was driven by a cash collateral order (which was negotiated by the lenders and the chapter 11 trustee) which included the following language:

> Unless a party in interest, including but not limited to, the Chapter 11 Trustee or chapter 7 trustee appointed in these Cases or the Committee, commences as appropriate, a contested matter or adversary proceeding raising any objection or challenge to the validity and perfection of the Pre–Petition Liens of the Pre–Petition Lenders by no later than February 28, 2002, all such challenges and objections shall be forever waived, and the Pre–Petition Obligations shall be allowed as a secured claim within the meaning of section 506 of the Bankruptcy Code for all purposes in connection with the Cases. Thereafter, any and all objections or challenges (including, but not limited to, those under sections 506, 544, 547 and/or 548 of the Bankruptcy Code), by any party (including, without limitation, any Chapter 11 or Chapter 7 trustee appointed herein) to the validity, sufficiency, extent, perfection, priority or refinancing of, or seeking the avoidance of, the Pre–Petition Liens, the Pre–Petition Obligations and any payments thereon, shall be forever barred.

The Committee was granted standing to initiate this adversary proceeding on the estate's behalf pursuant to an Entry of Judgement that was entered by this Court on June 27, 2002. That ruling is currently on appeal and no party to this action has sought a stay of this adversary proceeding pending that appeal.

transactions and the fact that the Amended Complaint, as drafted, provides ABB with enough information to adequately prepare a responsive pleading, the Court finds that the requirements of FED. R. CIV. P. 9(b) have been met.

### Causes of Action Based Upon Illegal Corporate Dividends and Illegal Corporate Stock Redemption

■ ABB contends that the Committee cannot advance claims against it based upon illegal corporate dividends or illegal corporate stock redemption because ABB received no compensation directly from ABB Services, Inc. but instead received cash on account of its shares in ABB Services, Inc. from some third party. Such contention ignores the Committee's allegation that all of the steps of the April 2000 transaction be collapsed into and viewed as one transaction.[19] It also ignores the liberal construction given the concept of dividends and stock redemption under Delaware law. *See, e.g., Penington v. Commonwealth Hotel Constr. Corp.,* 155 A. 514, 517 (Del.Ch.1931) (payment to stockholders as return on their investment is, in general, termed a dividend). If all of the steps in the April 2000 transaction are collapsed, it is not immediately clear from what entity ABB received the return for its investment in ABB Services, Inc.. At this stage of the litigation it does not appear beyond doubt that the Committee could prove a set of facts to support its claims that ABB received illegal corporate dividends or an illegal corporate stock re-

demption. Accordingly, ABB's motion to dismiss these claims will be denied.

### PRUDENTIAL'S MOTION TO DISMISS

The Committee sets forth multiple causes of action against Prudential as one of the Bank Defendants regarding the April 2000 and June 2001 transactions. One of those causes of action [count 3] alleges that transfers made to the Bank Defendants were fraudulent pursuant to § 544(b) of the Bankruptcy Code and related Ohio and Illinois law. [Am. Compl. ¶¶ 84–86]. The Committee also alleges that transfers made to the Bank Defendants were either insider [count 9] or non-insider [count 8] preferences pursuant to § 547(b) of the Bankruptcy Code. [Am. Compl. ¶¶ 99–103 and ¶¶ 104–109]. Additionally, the Committee requests that any claims held by the Bank Defendants be equitably subordinated [count 12] to the claims of general unsecured creditors pursuant to § 510(c) of the Bankruptcy Code. [Am. Compl. ¶¶ 123–124].[20]

### Cause of Action Based Upon Fraudulent Transfer

■ In the Amended Complaint the Committee does not separate Prudential out from any of the other Bank Defendants. However, unlike most of the other Bank Defendants, Prudential had an ongoing lender-borrower relationship with Grand Eagle that began in April 1999. Based upon this relationship and the fact that through the April 2000 transaction the principal amount of Grand Eagle's obli-

---

19. Although the Committee contends that all of the steps of the April 2000 transaction should be collapsed, it should also be prepared in this litigation to address the economics of each individual step should this Court not find that one large integrated transaction occurred.

20. The Committee also seeks the disallowance of any claims held by any and all of the defendants in this proceeding (*see* footnote 8, *supra*), and also requests a declaratory judgment determining the validity, extent and priority of all of the Bank Defendants' liens. [Am. Compl. ¶¶ 115–122]. Prudential, through its motion to dismiss, does not challenge either of these two causes of action.

gations to Prudential remained the same, Prudential contends that the Committee has not stated a claim based upon fraudulent transfer as to Prudential.

As noted above, to state a claim based upon constructive fraud pursuant to § 544(b) of the Bankruptcy Code and either Ohio or Illinois law, the Committee must, as a threshold matter, demonstrate that Grand Eagle and/or the Subsidiaries made a transfer to Prudential without receiving reasonably equivalent value in exchange for that transfer. OHIO REV. CODE ANN. § 1336.04 (Anderson 1993); 740 ILL. COMP. STAT. ANN. 160/8 (West 2002). In the Amended Complaint, the Committee alleges the following regarding Prudential's role in the Bank Financing:

55. On the Closing Date, Prudential held $17.5 million of the new term loans as an original lender, with Creditor Agricole serving as agent. Prior to the Acquisition Transaction, Prudential held a different note from Grand Eagle in the principal amount of $17.5 million that was satisfied and refinanced by the Bank Financing.

56. Prudential also held a $15 million subordinated note from Grand Eagle prior to the Acquisition Transaction (the "Sub–Debt"). In addition to the Bank Financing, in which Prudential participated, the Sub Debt was reaffirmed on modified terms.

[Am. Compl. ¶¶ 55–56]. Although it appears that Prudential received some form of security from Grand Eagle and the Subsidiaries for the exchange of its old notes,[21] the face value of those notes remained the same and there is no allegation in the Amended Complaint that the exposure of either Grand Eagle or the Subsidiaries to Prudential was increased. Although the Committee does contend that "the assets and earnings of the Debtors were, as of the Closing Date, grossly inadequate to service the level of debt that Debtors were left with as a result of the Acquisition Transaction" [Am. Compl. ¶ 61], this debt level does not appear to have been affected by Prudential's participation in the Bank Financing. The Committee has not challenged the 1999 transaction in which Grand Eagle initially became indebted to Prudential.

The Committee contends that its fraudulent transfer claim against Prudential must be allowed to proceed because it has alleged "sufficient facts regarding the Acquisition Transaction for the Court to view it as a single integrated transaction that resulted in the Bank Defendants receiving security interests in the Debtors' assets, while giving less than reasonably equivalent value to Debtors in return." [Comm. Resp. Mem. at pg. 4]. However, upon review of the Amended Complaint, the Court can find no allegation that Prudential's receipt of some form of security for the exchange of its old notes was for less than reasonably equivalent value. Although on a motion to dismiss this Court must accept all well-pleaded factual averments as true, it need not accept as true legal conclusions and unwarranted factual inferences and it need not conjure up unpleaded facts that might turn a frivolous claim into a substantial one. *See, e.g., Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987). Accordingly, the Court finds that Prudential's motion to dismiss the Committee's fraudulent transfer claim against it is well taken and will be granted.

---

21. Being that Prudential is not separately addressed as a defendant the Amended Complaint is not clear as to what form of security Prudential received. *See, e.g.,* Am. Compl. ¶ 53.

### Causes of Action Alleging Preferential Transfer

■ In the Amended Complaint, the Committee sets forth 35 paragraphs of "general allegations" that describe the April 2000 and the June 2001 transactions. In its motion to dismiss Prudential contends that, given the timing of those two transactions, neither can be challenged as preferential pursuant to § 547(b) of the Bankruptcy Code. As to the April 2000 transaction, the Committee agrees with Prudential's contention:

> The Prudential Motion suggests that Prudential is confused by emphasis in other counts of the Amended Complaint on earlier transactions that took place on April 7, 2000. Those transactions are the basis for the fraudulent transfer claims, and other claims, asserted in the Amended Complaint. Although those transactions also involve transfers to Prudential, *they fall outside the preference periods and they are not relevant to the Eighth and Ninth Claims for Relief.*

[Comm. Resp. Mem. at pg. 15] (emphasis added). However, as to the June 2001 transaction and other payments made by Grand Eagle to the Bank Defendants during 90 days and one year prior to the bankruptcy petition date, the Committee claims that it has stated viable claims:

> These latter transactions are the basis for the preference claims. The Committee has not yet conducted discovery and has not yet obtained detailed information from the Debtors or the chapter 11 trustee regarding the specific payments to Prudential. However, Grand Eagle's Statement of Financial Affairs reveals payments in excess of $600,000 to the agent for the Bank Defendants during the 90 days prior to the Petition Date. If the Committee is successful in avoiding Prudential's security interest in the Debtors' assets, or if Prudential is determined to have been undersecured at the time of the payments, the payments made to Prudential during the preference periods will be avoidable under Section 547(b).

[Comm. Resp. Mem. at pg. 15].

In the Amended Complaint the Committee does not include any information regarding "payments in excess of $600,000" or any other payments that were allegedly made to the Bank Defendants during relevant preference periods prior to the Petition Date nor does it include any information about the value of the property that secured Prudential's loans. Instead the Committee merely alleges each element of a statutory claim pursuant to § 547(b) of the Bankruptcy Code. [Am. Compl. ¶¶ 99–103 and ¶¶ 104–109]. Given the pleading requirements of FED. R. BANKR. P. 7008(a) and FED. R. CIV. P. 8(a), the Committee's omission of more specific factual allegations is not fatal to its preferential transfer claims especially in light of the fact that the Committee is a third party outsider to the challenged transactions and was operating under a significantly shortened time frame in which to file the Amended Complaint. *See* footnote 18, *supra*. *See also, Minkoff v. Steven Jrs., Inc.,* 260 F.2d 588, 589–90 (2nd Cir.1958) ("merely pleading in broad terms does not amount to failure to state a claim, especially when as here the generality of the pleading arises from use of the statutory language").

Notwithstanding the finding that Prudential's security interests cannot be challenged by the Committee as fraudulent transfers, payments made to Prudential within relevant preference periods prior to the Petition Date may be avoidable if Prudential was not a fully secured lender. Accordingly, the Committee is entitled to proceed on its preference claims against Prudential.

## Cause of Action Alleging Equitable Subordination

 To succeed on a claim of equitable subordination, the Committee must demonstrate that (1) the claimant engaged in some type of inequitable conduct; (2) the misconduct resulted in injury to creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim is not inconsistent with the provisions of the Bankruptcy Code. *Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics)*, 269 F.3d 726, 744 (6th Cir.2001). Satisfaction of this three-part standard does not mean that this Court is required to equitably subordinate a claim, but only that such action may be taken as "equitable subordination is an unusual remedy which should be applied in limited circumstances." *Id.* at 744–45 (citation omitted).

Notwithstanding Prudential's pre-existing lender relationship with Grand Eagle and the Pre–Transaction Subsidiaries, the Committee does not separate Prudential out from any of the other Bank Defendants. Instead the Committee alleges that all of the Bank Defendants' claims should be equitably subordinated because they engaged in misconduct by "causing, participating in, and aiding and abetting the fraudulent transfers and illegal dividends, distributions, and redemptions to ABB and the Former Shareholders alleged herein, and for receiving the benefit of those fraudulent transfers . . . ." [Amend. Compl. ¶ 124]. Although such broad sweeping allegations may be appropriate to state a claim for equitable subordination as to the other Bank Defendants who only became involved with Grand Eagle and the Pre–Transaction Subsidiaries through the April 2000 transaction, it will not suffice as to Prudential given its pre-existing lender relationship and the Court's finding that the Committee cannot advance a claim against Prudential for fraudulent transfer.

## CONCLUSION

Based upon the foregoing the Court finds that ABB's motion to dismiss is not well taken and should be denied in its entirety. The Court further finds that Prudential's motion to dismiss is well-taken as to the Committee's claims of fraudulent transfer and equitable subordination. Prudential's motion to dismiss the Committee's claim regarding preferential transfers is not well taken and should be denied. A separate entry of judgment consistent with this Memorandum Opinion will be entered as a separate pleading in this case. The Court will also issue a separate notice setting a further pre-trial conference in this matter.

**IT IS SO ORDERED.**