United States Court of Appeals,

Eleventh Circuit.

No. 94-9046.

Matter of MUNFORD, INC., a/k/a Majik Market, Debtor.

Danné Brokaw MUNFORD, as Executrix of the Estate of Dillard Munford;  James M. Carroll;  Russell Fellows;  Joseph W. Hardin;  Jay Rubel;  Winston M. Blount;  Herbert J. Dickson;  James L. Ferguson;  Robert M. Gardiner;  Richard K. Leblond;  Andrall E. Pearson;  S.B. Rymer, Jr., Shearson Lehman Brothers, Inc.;  DFA Investment Dimensions Group, Inc.;  State Street Bank & Trust Company;  PNC Bank, National Association;  Boston Safe Deposit and Trust Company, Plaintiffs-Appellees,

v.

VALUATION RESEARCH CORPORATION, Defendant,

Munford, Inc., Defendant-Appellant.

Oct. 28, 1996.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:94-00348-CV-GET), G. Ernest Tidwell, Chief Judge.

Before HATCHETT, Chief Judge, CLARK, Senior Circuit Judge, and MILLS[*], District Judge.

PER CURIAM:

As a matter of first impression in this circuit, we hold that 11 U.S.C. § 546(e) does not bar the trustee in bankruptcy from avoiding payments the debtor corporation made to its shareholders in a leveraged buy-out.

FACTS

In August 1987, Dillard Munford, the founder and chief executive officer of Munford, Inc., suggested to Munford, Inc.'s board of directors (the board) that it sell Munford, Inc.  At that

---

[*]Honorable Richard Mills, U.S. District Judge for the Central District of Illinois, sitting by designation.

time, Munford, Inc., a public company, operated three specialty retailer stores: Majik Market, a chain of convenience stores; World Bazaar, a chain of stores specializing in imported goods; and Lee Ward's Creative Crafts, an arts and crafts chain. Munford, Inc. also owned a majority interest in United Refrigerator Services, Inc. (URS). Based on Dillard Munford's suggestion, the board retained Shearson Lehman Brothers (Shearson) to evaluate Munford, Inc.'s financial viability and its fair market value. Following this evaluation, Shearson would make recommendations regarding how to best maximize shareholder value in the event the board decided to sell Munford, Inc.

In September 1987, Shearson presented a written report to the board identifying several selling options. Shearson, for example, opined that a sale of all of Munford's common stock would afford Munford, Inc. the most desirable means of maximizing shareholder value while preserving its financial viability. In contrast, Shearson disfavored a leverage buy-out (LBO) or a leverage recapitalization opining that Munford, Inc. would need all of its internally generated cash flow to fund growth. Consequently, Shearson believed that Munford, Inc. could not carry the heavy debt load associated with a leverage transaction. After reviewing Shearson's report, the board authorized Shearson to prepare an offering memorandum and solicit potential purchasers for Munford, Inc. During this same period of time, Munford, Inc. executed severance contracts with senior officers Dillard Munford, Russell C. Fellows, and James M. Carroll agreeing to pay these officers severance pay in yearly installments upon the closing of the sale

of Munford, Inc.  In exchange, these officers promised to continue their employment with Munford, Inc. until it secured a purchaser. Despite Shearson's aggressive efforts to solicit potential purchasers of Munford, Inc., no one offered to purchase all of Munford, Inc.'s common stock.  Faced with this reality, the board began considering LBO offers.

In January 1988, Deutschman & Co. offered to purchase Munford Inc.'s stock in an LBO.  In February 1988, the board tentatively agreed to sell Munford, Inc. to Deutschman, but Deutschman withdrew its offer on March 3, 1988, after performing a due diligence examination.  On May 2, 1988, Munford, Inc. sold its Lee Ward's stores to Prudential Bache because it had failed to secure a single purchaser for Lee Ward's stock.  Later that month, the board received an offer from the Panfida Group to purchase its Majik and World Bazaar stores for $18.50 per share.  On May 23 the board met with its lawyers and Shearson's representatives to consider the Panfida Group's offer.  At that meeting, Munford Inc.'s lawyers advised the board that they had consulted with Citicorp and Citicorp confirmed its willingness to work with the Panfida Group. Shearson also advised the board that the Panfida Group had the backing of a company with assets in excess of $60 million.  In addition, Shearson's representative stated that he was favorably impressed with the Panfida Group's ability to obtain financing.  On June 1, 1988, Phillip Handy, the spokesperson for the Panfida Group, met with the board to discuss the proposal.  During the meeting, Handy informed the board that the Panfida Group had purchased 291,177 shares of Munford, Inc. stock as evidence of its

commitment to purchase Munford, Inc. Handy also noted that the Panfida Group intended to put additional capital into the company; however, he also advised the board that Panfida's equity participation would only be as much as Citibank required to finance the purchase.

On June 17, Munford, Inc. sold its stock in URS for $45.5 million and used the proceeds to pay company debt. Also during the month of June, the Panfida Group and Citicorp began a due diligence examination of Munford Inc.'s business records. After discovering potential environmental liability at some of the Majik stores, the Panfida Group decided to reduce its purchase price from $18.50 a share to $17 a share. The board approved the Panfida Group's new offering price and the proposed merger agreement. The proposed merger agreement required the Panfida Group to create Alabama Acquisition Corporation (AAC) and a subsidiary, Alabama Merger Corporation (AMC). The merger agreement also required the Panfida Group through AAC or AMC to deposit the funds necessary to purchase Munford Inc.'s outstanding stock with Citizens & Southern Trust Company, a financial institution within the securities clearance and settlement system.

Prior to finalizing the merger plan, AAC warranted to the board that the post-merger Munford, Inc. would remain solvent, would have a reasonable amount of working capital, and would have the ability to pay its debts as they came due. After receiving this assurance, Munford, Inc.'s lawyers prepared a detailed proxy statement for Munford, Inc.'s 3,100 shareholders outlining the

merger agreement.[1]  On October 18, 1988, the shareholders approved the merger plan.  As provided in the merger agreement, each share of common stock was converted into the right to receive the merger price of $17 per share and extinguished the shareholders' ownership interest in Munford, Inc.  The Panfida Group retired the 291,177 shares it purchased prior to the LBO merger without payment.  The sale of Munford, Inc. to the Panfida Group closed on November 29, 1988.  Thirteen months after the LBO transaction, on January 2, 1990, the post-Munford Corporation filed a Chapter 11 case in bankruptcy court.

## PROCEDURAL HISTORY

On June 17, 1991, Munford, Inc. filed an adversary proceeding in bankruptcy court in the Northern District of Georgia on behalf of itself and unsecured creditors pursuant to 11 U.S.C. §§ 544(b) and 1107(a) (1988), seeking to recover LBO payments made to Munford, Inc.'s shareholders, severance payments made to Munford, Inc.'s officers and damages against directors, officers, and Shearson for breach of fiduciary obligations to Munford, Inc.

In Count I of Munford, Inc.'s complaint, it asserts fraudulent conveyance claims against two of Munford, Inc.'s largest former shareholders, the DFA Investment Dimensions Group, Inc. and Trustees of the DFA Group Trust.  In Count I, Munford, Inc. also asserts fraudulent conveyance claims against former directors and officers who received payments for their Munford, Inc. shares in

---

[1]Munford, Inc.'s shareholders had no dissenter's rights of appraisal under O.C.G.A. § 14-2-250(d)(2) (1988), because Munford listed its shares on the New York Stock Exchange and because more than 2,000 shareholders held the stock.

the LBO.[2]  In Counts II and IV, Munford, Inc. asserts breach of fiduciary duty, negligence, mismanagement, and waste of corporate assets claims against the officers and directors.  In Count III, Munford, Inc. asserts that the directors violated Georgia's share repurchase and distribution statutes in approving the LBO transaction.  In Count V, Munford, Inc. asserts that the severance payments made to Dillard Munford, Fellows, and Carroll constituted fraudulent conveyances.  In Count VI, Munford, Inc. claims that Shearson breached its fiduciary duty.  Finally, in Count IX Munford, Inc. claims that Shearson aided and abetted the directors and officers' alleged breaches of fiduciary duty.

The shareholders, directors, officers, and Shearson (collectively appellees) filed motions for summary judgment contending that each of Munford, Inc.'s claims failed as a matter of law.  On April 5, 1994, the bankruptcy court filed its proposed findings of fact and conclusions of law recommending that the district court grant Shearson's motion for summary judgment.  In a separate proposed findings of fact and conclusion of law, the bankruptcy court recommended that the district court deny the shareholders, officers, and directors' motions for summary judgment.  The district court adopted the bankruptcy court's recommendation in part granting summary judgment in favor of

---

[2]Count I specifically asserts claims against Dillard Munford, chief executive officer;  Russell C. Fellows, president and chief operating officer;  James M. Carroll, vice president and secretary;  Joseph W. Harden, vice president and treasurer;  and J.E. Rubel.  Count I also asserts claims against directors Dillard Munford, Fellows, Robert M. Gardiner, Richard K. LeBlond, II, Herbert J. Dickson, Winston M. Blount, S.B. Rymer, Jr., Andrall E. Pearson, and James L. Ferguson.

Shearson. The district court also adopted the bankruptcy court's recommendation with respect to Count III and denied the directors' motion for summary judgment on the distribution statute claim. The district court, however, rejected the bankruptcy court's recommendation as to Munford, Inc.'s claims against the shareholders, directors, and officers with respect to Counts I, II, and IV, and granted summary judgment on those counts on August 4, 1994.

On August 26, 1994, the district court amended its order, pursuant to Federal Rules of Civil Procedure 54(b), and entered final judgment to allow this appeal to proceed. Munford, Inc. now appeals the district court's grant of summary judgment in favor of the shareholders, officers, and directors on Counts I, II, and IV. Munford, Inc. also appeals the district court's granting of summary judgment in favor of Shearson on Count IX and has abandoned its claims under Count VI.[3]

CONTENTIONS

Munford, Inc. raises four contentions. First, Munford, Inc., contends that the district court erred in concluding that the LBO payment shareholders received for their shares constituted a settlement payment within the meaning of 11 U.S.C. § 546(e). Second, Munford, Inc., contends that the district court erred in concluding that its breach of fiduciary duties, negligence, mismanagement, and waste of corporate asset claims against the

---

[3]The directors also appeal the district court's denial of their motion for summary judgment on Munford, Inc.'s share repurchase and distribution claim (Count III) in Case No. 94-9216.

directors and officers failed as a matter of law.  Specifically, Munford, Inc. argues that sufficient evidence supports its claim that the directors and officers failed to fulfill their fiduciary obligations to evaluate the proposed LBO merger agreement.  Third, Munford, Inc. contends that the severance payments made to its officers lacked consideration;  therefore, the district court erred when it concluded that the payments did not constitute a fraudulent conveyance under Georgia law.  And finally, Munford, Inc. contends that the district court erred in granting summary judgment in favor of Shearson on its aiding and abetting breach of fiduciary duty claim because Georgia courts would recognize this claim.

Appellees contend that the district court properly granted summary judgment in their favor on each of the claims.

ISSUES

We address the following issues:  (1) whether the LBO payments received in exchange for shares constituted a settlement payment within the meaning of section 546(e);  (2) whether the district court erred in granting summary judgment in favor of the officers and directors on Munford, Inc.'s claims of breach of fiduciary duty, negligence, mismanagement, and waste of corporate assets; (3) whether Munford, Inc.'s severance payments to its officers constituted fraudulent conveyances under Georgia law;  and (4) whether the district court erred in granting summary judgment in favor of Shearson on Munford, Inc.'s aiding and abetting claims.

DISCUSSION

A. LBO Payments

We review the grant of summary judgment *de novo*.  *Orlando*

*Helicopter Airways v. United States,* 75 F.3d 622, 624 (11th Cir.1996). Summary judgment is appropriate where no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Canadyne-Georgia Corp. v. Continental Ins. Co.,* 999 F.2d 1547, 1554 (11th Cir.1993).

Pursuant to 11 U.S.C. § 544(b), a trustee in bankruptcy or the debtor acting as trustee may avoid any transfer of property of the debtor that is voidable under the applicable state law unless otherwise stated in the Bankruptcy Code. 11 U.S.C. § 544(b). Section 544(b) is commonly referred to as the "strong arm" clause. One exception to the trustee's avoidance power exists under section 546(e). Section 546(e) states in pertinent part:

> Notwithstanding section 544 ... of this title, the trustee may not avoid a transfer that is ... [a] settlement payment, as defined in section 741(8) of this title, made by or to a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency, that is made before the commencement of the case, except under section 548(a)(1) of this title.

11 U.S.C. § 546(e) (1988). Congress enacted section 546(e) "to minimize the displacement caused in the commodities and securities market in the event of a major bankruptcy affecting those industries." H.R.Rep. No. 97-420, 97th Cong., 2d Sess. 1 (1982), U.S.Code Cong. & Admin.News 583. With the passage of section 546(e), "Congress [also] sought to "promote customer confidence in commodity markets generally' via "the protection of commodity market stability.' " *Kaiser Steel Corp. v. Charles Schwab & Co.,* 913 F.2d 846, 849 (10th Cir.1990) (quoting Sen. R. No. 989, 95th Cong., 2d Sess. 8 (1978)).

In this case, the district court entered summary judgment in

favor of the shareholders on Munford, Inc.'s fraudulent conveyance claim finding that the LBO payments Munford, Inc. made to the shareholders constituted settlement payments within the meaning of section 741(8). *See* 11 U.S.C. § 741(8). Consequently, the district court held that 11 U.S.C. § 546(e) did not authorize a bankruptcy trustee or a debtor in possession acting as trustee to avoid such transfers under state law because the shareholders received their settlement payments from Citizens & Southern Trust Company, a financial institution. On appeal, Munford, Inc. contends that the district court erred in concluding that the LBO payments the shareholders received for their shares constituted settlement payments for purposes of section 546(e).

Section 741(8) defines "settlement payment" as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or *any other similar payment commonly used in securities trade.*" 11 U.S.C. § 741(8) (1988) (emphasis added). Munford, Inc. does not argue that LBO payments are uncommon. Rather, it urges this court to define settlement payments in the context of LBOs narrowly, asserting that LBO mergers are essentially private transactions between the merging companies and their existing shareholders and therefore do not sufficiently involve the securities settlement and clearance system. Munford, Inc. notes that this LBO merger did not use the clearance and settlement system to match buyers with sellers of securities, account for the transaction, or guarantee the transaction. Munford, Inc. asserts that the settlement and clearance system was

simply used to convey the LBO payments to the tendering shareholders. Munford, Inc. further argues that characterizing the LBO payments as settlement payments does not advance the goal of protecting the clearance and settlement system because LBO transactions do not utilize the entire clearance and settlement system.[4] Finally, Munford asserts that construing the LBO payments as settlement payments wholly frustrates the remedial goal of fraudulent conveyance law and the fair treatment of unsecured creditors. The shareholders, on the other hand, contend that construing section 546(e) to apply to the LBO payments promotes investor confidence in the securities market. To hold otherwise, the shareholders argue, would undermine all mergers or acquisitions of public companies.

The court concludes that whether the LBO payments qualify as section 546(e) settlement payments is not dispositive of the dispute—in fact, the court will presume that the LBO payments were settlement payments. Although the payments were presumptively settlement payments, section 546(e) is not applicable *unless* the transfer (or settlement payment) was "made by or to a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency." 11 U.S.C. § 546(e).

---

[4]In support of its position, Munford, Inc. cites *Wieboldt Stores, Inc. v. Schottenstein,* 131 B.R. 655 (N.D.Ill.1991). In *Wieboldt,* the district court held that LBO payments do not constitute a settlement payment within the meaning of the Code, reasoning that permitting avoidance of LBO payments posed no significant threat to the clearance and settlement system in the securities industry. *Wieboldt,* 131 B.R. at 664-65. We reject the reasoning of *Wieboldt* finding that even granting trustees avoidance powers under limited circumstances in the LBO context has the potential to lessen confidence in the commodity market as a whole.

Here, the transfers/payments were made *by* Munford *to* shareholders. None of the entities listed in section 546(e)— *i.e.,* a commodity broker, forward contract merchant, stockbroker, financial institution, or a securities clearing agency—made or received a transfer/payment. Thus, section 546(e) is not applicable.

True, a section 546(e) financial institution was presumptively involved in this transaction. But the bank here was nothing more than an intermediary or conduit. Funds were deposited with the bank and when the bank received the shares from the selling shareholders, it sent funds to them in exchange. The bank never acquired a beneficial interest in either the funds or the shares.

Importantly, a trustee may only avoid a transfer to a "transferee." *See* 11 U.S.C. § 550. Since the bank never acquired a beneficial interest in the funds, it was not a "transferee" in the LBO transaction. *See In re Chase & Sanborn Corp.,* 848 F.2d 1196, 1200 (11th Cir.1988) ("When banks receive money for the sole purpose of depositing it into a customer's account ... the bank never has actual control of the funds and is not a § 550 transferee."). Rather, the shareholders were the only "transferees" of the funds here. And, of course, section 546(e) offers no protection from the trustees avoiding powers to shareholders; rather, section 546(e) protects only commodity brokers, forward contract merchants, stockbrokers, financial institutions, and securities clearing agencies. Accordingly, regardless of whether the payments qualify as settlement payments, section 546(e) is not applicable since the LBO transaction did not

involve a transfer to one of the listed protected entities.[5]  We conclude that the district court erred with respect to this issue and reverse.

B. Breach of Fiduciary Duty and Related Claims

We next address Munford, Inc.'s contention that the district court erred in granting summary judgment in favor of the officers and directors on Munford, Inc.'s claims of breach of fiduciary duty, negligence, mismanagement, and waste of corporate assets.

Section 14-2-152.1(a)(1) of the Georgia Code requires directors and officers of companies to discharge their duties in good faith and with the care of an ordinary prudent person. Munford, Inc. contends that the district court erred in concluding that no disputed material facts existed as to whether the directors and officers discharged their duties in good faith and with the care of an ordinary prudent person.  Specifically, Munford, Inc., argues that substantial evidence supports its contention that the directors and officers approved the LBO without considering the economic effect of the transaction upon the corporation in violation of section 14-2-152.1(a)(1).  In support of this argument, Munford, Inc. makes two assertions. First, Munford, Inc. asserts that the officers and directors disregarded Shearson's September 1987 written report disfavoring LBO transactions.[6]

---

[5]For a discussion of this issue, *see In re Healthco Int'l Inc. v. Hicks, Muse & Co., Inc.,* 195 B.R. 971, 981-83 (Bankr.D.Mass.1996).

[6]In that report, Shearson opined that Munford, Inc. needed all of its internally generated cash flow to fund growth and could not be able to finance increased leverage resulting from financial restructuring.

Second, Munford, Inc. asserts that officers and directors disregarded Deutschman's reasons for refusing to proceed with its planned purchase of Munford, Inc.

In addition, Munford, Inc. argues that Article 9 of its Articles of Incorporation creates a private right of action on behalf of creditors independent of section 14-2-152.1(a)(1). Munford, Inc. notes that Article 9 requires the directors and officers to give due consideration to " "the extent to which the assets of the corporation will be used' for financing and "the social, legal, and economic effects of the transaction on the employees, customers, and other constituents of the corporation.' " Based on this language, Munford, Inc. asserts that directors and officers have a higher duty of care than imposed under state law.

The directors and officers contend that they discharged their duties in good faith and with the care of an ordinary prudent person. The directors and officers also argue that they made an informed judgment when they decided to accept Panfida's LBO proposal. They stress that they hired Shearson to perform a financial assessment of Munford, Inc., consulted attorneys regarding their duties to the company, including their duties under the Articles of Incorporation throughout their decision-making process, and that at all times during their service to Munford, Inc., the company was solvent. They therefore argue that in deciding whether to sell Munford, Inc. they had an unqualified duty to maximize shareholder value. With respect to Munford, Inc.'s post-LBO financial stability, the directors and officers argue that Citicorp's decision to finance the LBO merger and AAC's

warranty—that post-LBO Munford, Inc. would remain solvent, have a reasonable amount of working capital, and have ability to pay its debt—led them to believe that Munford, Inc. could carry the heavy load associated with a leveraged transaction. Finally, the directors and officers contend that Article 9 did not establish a fiduciary duty greater than under state law or create a private right of action on behalf of creditors. Although Article 9 provides that directors give due consideration to social, legal, and economic effects of a transaction on employees, customers, and other constituents of the corporation, the directors and officers argue that this provision does not identify creditors as persons to whom due consideration is owed. The directors and officers therefore argue that a constituency's interest is only relevant when the consideration of the constituency also benefits the shareholders.

In determining whether directors and officers have satisfied their statutory duty, Georgia courts apply the business judgment rule. *See Millsap v. American Family Corp.,* 208 Ga.App. 230, 430 S.E.2d 385, 388 (1993). The business judgment rule protects directors and officers from liability when they make good faith business decisions in an informed and deliberate manner. *Cottle v. Storer Communication, Inc.,* 849 F.2d 570, 575 (11th Cir.1988). In this case, the record is replete with evidence that the directors and officers consulted legal and financial experts throughout the solicitation and negotiation for a purchaser for Munford, Inc. Applying the business judgment rule, we conclude that the directors and officers satisfied their duties under section 14-2-152.1(a)(1).

Because Munford, Inc. has failed to present any binding legal authority to support its contention that Article 9 creates a cause of action independent of Georgia law, we reject this argument. Accordingly, we affirm the district court's grant of summary judgment on this issue.

C. Severance Contracts

The district court also granted summary judgment in favor of the officers and directors on Munford, Inc.'s fraudulent conveyance claims. In its complaint, Munford, Inc. alleged that the severance payments it made to Dillard Munford, Fellows and Carroll lacked consideration, and therefore constituted fraudulent conveyances under Georgia law.[7] In order for Munford, Inc. to establish a fraudulent conveyance claim under Georgia law, it must show: (1) a conveyance of property; (2) valuable consideration; and (3) that it was insolvent at the time of the conveyance or that the conveyance rendered it insolvent. *Brown,* 317 S.E.2d at 183.

The district court entered summary judgment finding that valuable consideration in the form of the officers' promises to continue employment through the closing of the sale of Munford, Inc. supported the severance payments. Munford, Inc. contends that the district court erred in concluding that Munford, Inc. received

---

[7]Section 18-2-22 of the Georgia Code provides:

> The following acts by debtors shall be fraudulent in law against creditors and others and as to them shall be null and void ... every voluntary deed or conveyance *not for a valuable consideration* made by a debtor who is insolvent at the time of the conveyance.

*Brown v. Citizens & Southern National Bank,* 253 Ga. 119, 317 S.E.2d 180, 183 (1984) (quoting O.C.G.A. § 18-2-22(3)) (emphasis added).

valuable consideration in exchange for the severance contracts. Munford, Inc. argues that Dillard Munford's testimony refutes the finding that Dillard Munford's promise constituted valuable consideration because he stated in his deposition testimony that he would have remained with the company through closing in spite of his severance contract. Based on this admission, Munford, Inc. asserts that all of the severance payments constituted gifts rewarding these officers for past services for which they had already been paid.

Dillard Munford, Fellows, and Carroll respond to Munford, Inc.'s arguments asserting that their existing severance contracts each arose due to preexisting severance contracts executed in 1979 or earlier. They also argue that their continued services to the company—beginning with Munford, Inc.'s search in 1987 for a single purchaser for its outstanding stock and ending in 1988 when Munford, Inc. closed the LBO transaction with the Panfida Group—provided sufficient consideration for the severance payments. Specifically, they argue that they provided general corporate management services, advice, strategy, and guidance to Munford, Inc. during the relevant period.

We conclude that Munford, Inc.'s argument lacks merit. Georgia courts hold that "valuable consideration is founded on money or something convertible into money, or having value in money." *Stokes v. McRae*, 247 Ga. 658, 278 S.E.2d 393, 394 (1981). Georgia case law also clearly states that, "[c]ontinued performance under a terminable at-will contract furnishes sufficient consideration for the promise of additional severance pay." *Royal*

*Crown Companies, Inc. v. McMahon*, 183 Ga.App. 543, 359 S.E.2d 379, 381 (1987). We note that this rule of law leads to a just result in this case. If Munford, Inc. had not entered into the severance payment contract and these officers left Munford, Inc. prior to the closing of the LBO, Munford, Inc.'s efforts to sell its stock to a single purchaser probably would have been frustrated. Also, Munford, Inc. would have been without recourse against these officers because Munford, Inc. employed these officers as employees at-will. The severance contracts giving rise to the severance payments, however, provided Munford, Inc. with the assurance that the officers would not leave without providing Munford, Inc. recourse in the event their leaving frustrated its plans to sell its stock to a single purchaser. We therefore find that this assurance constituted valuable consideration. Accordingly, we affirm the district court's grant of summary judgment on this claim.

D. The "Aiding and Abetting" Claim

The last issue we address is whether the district court erred in concluding that Munford, Inc.'s claim of aiding and abetting a breach of fiduciary duty against Shearson failed as a matter of law. Munford, Inc. urges this court to recognize a cause of action for aiding and abetting a breach of fiduciary duty under Georgia state law, arguing that Georgia courts would recognize the tort of aiding and abetting a breach of fiduciary duty. Such an action, Munford, Inc. contends, would require a showing of (1) a fiduciary duty on the part of the primary wrongdoer, (2) a breach of fiduciary duty, (3) the knowledge of the breach by the alleged

aider and abettor, and (4) the aider and abettor's substantial assistance or encouragement of the wrongdoing. Munford, Inc. argues that it has satisfied this showing. Specifically, Munford, Inc. alleges that Shearson aided and abetted the directors' and officers' breach of fiduciary duty when it provided a fairness opinion concerning the Panfida Group's offering price enabling the LBO transaction to go forward. It also asserts that Shearson, based upon its 1987 report, knew that LBO was not financially prudent for Munford, Inc. and knew that Munford, Inc.'s financial condition continued to deteriorate. In support of its argument that this court should recognize an aiding and abetting action, Munford, Inc. notes that Georgia courts have acknowledged an aiding and abetting cause of action in torts involving violence, the sale of unregistered securities, breaches of covenants with employment contracts, and fraudulent conveyances. In response, Shearson argues that the district court correctly held that the "imposition of aider and abettor liability for breaches of fiduciary duty essentially extends fiduciary obligations beyond the scope of the confidential or special relationship" on which the directors' and officers' obligations are based.

In the absence of state law, we are "obliged to resolve the issue of law as the Georgia state court would." *Imperial Enterprises, Inc. v. Fireman's Fund Ins. Co.,* 535 F.2d 287, 290 (5th Cir.1976). In this case, we decline to extend aider and abettor liability to breaches of fiduciary duty concluding that Georgia courts would not recognize such a cause of action. To hold otherwise, as the district court found, would enlarge the fiduciary

obligations beyond the scope of a confidential or special relationship. It is important to note that in this case Munford, Inc. does not claim that Shearson failed to fully advise Munford, Inc. of the potential risk of the LBO. The board, after considering the risk Shearson identified, decided to proceed with the LBO despite Shearson's initial caution to them. Moreover, the board directed Shearson to conduct a fairness report with respect to Panfida's offer. Shearson issued this report as directed. Munford, Inc. now seeks to hold Shearson liable for performing its task competently and with full disclosure. Even assuming that Georgia courts will someday recognize a cause of action for aider and abettor liability in the context of a breach of fiduciary duty claim, the facts in this case do not warrant its creation now.

### CONCLUSION

For the foregoing reasons, we reverse the district court's grant of summary judgment in favor of the shareholders on Munford, Inc.'s fraudulent conveyance claim. We affirm summary judgment on the remaining claims.

AFFIRMED in part; REVERSED in part; and REMANDED for further proceedings.

HATCHETT, Chief Judge, concurring in part and dissenting in part.

I agree with the majority opinion insofar as it concludes that the district court did not err in granting the directors, officers and Shearson summary judgment. I do not agree, however, with the majority's holding that the district court erred in granting the shareholders summary judgment.

Section 546(e) precludes the trustee in bankruptcy from

avoiding settlement payments made by or to a financial institution, commodity broker, forward contract merchant, stockbroker, or securities clearing agency unless the debtor company made such payments with the "actual intent to hinder, delay or defraud" creditors. 11 U.S.C. § 548(a)(1); *see also* 11 U.S.C. § 546(e). In this case, Munford, Inc. deposited funds to purchase its outstanding stock with Citizens & Southern Trust Company, a financial institution. Citizens & Southern Trust Company then made settlement payments to the shareholders for their stock. Munford, Inc., acting as trustee, filed this action seeking to avoid the payments Citizens & Southern Trust Company made to the shareholders. The district court granted summary judgment in favor of the shareholders concluding that section 546(e) barred the avoidance of settlement payments "made by" a financial institution.

In reversing the grant of summary judgment, the majority holds that whether the LBO payments qualify as settlement payments under section 546(e) is not dispositive on the issue of whether a trustee in bankruptcy can avoid such transfers under state law. Instead, the majority concludes that the dispositive issue is whether the financial institution acquired a beneficial interest in the settlement payments. I believe the majority, rather than require Munford, Inc. to prove "actual intent to hinder, delay or defraud" its creditors, chose to disregard the plain language of section 546(e) in order to create a new exception to its application. Because I believe that LBO payments made to shareholders constitute settlement payments for purposes of section 546(e) and that section 546(e) only permits a trustee in bankruptcy to avoid settlement

payments made to shareholders by a financial institution when such payments are made with the actual intent to hinder, delay or defraud creditors, I respectfully dissent.