# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 04-2204

_____

In re: Operation of the Missouri
River System Litigation

_____

State of North Dakota, through the
North Dakota Department of
Health, an Agency of the State of
North Dakota; John Hoeven,
Governor; Wayne Stenehjem,
North Dakota Attorney General,
Ex. Rel. State of North Dakota;
North Dakota Department of
Health,

        Appellants,

      v.

United States Department of the
Army, the Corps of Engineers, a
Federal Agency; David Fastabend,
General Commander, Nw
Division, Portland, Oregon,
United States Army Corps of
Engineers; Kurt F. Ubbelohde, Lt.
Colonel, District Engineer,
Omaha District,

        Appellees,

Appeal from the United States
District Court for the District of
Minnesota.

State of Nebraska,                     *
                                       *
        Appellee,                     *
                                       *
State of Missouri,                     *
                                       *
        Intervenor on Appeal.        *
_____                      *
                                       *
State of South Dakota,                 *
                                       *
        Amicus on Behalf of          *
        Appellant,                   *
                                       *
The Mandan, Hidatsa and Arikara        *
Nation,                                *
                                       *
        Amicus on Behalf of          *
        Appellant.                   *


_____

Submitted:  April 11, 2005
Filed:  August 16, 2005
_____

Before WOLLMAN, BEAM, and GRUENDER, Circuit Judges.
_____

GRUENDER, Circuit Judge.

North Dakota appeals the district court's[1] dismissal of its suit to enjoin the United States Army Corps of Engineers ("the Corps") from releasing water from Lake Sakakawea to support downstream navigation on the Missouri River. North Dakota's complaint alleges that the releases violate water quality standards for Lake Sakakawea established pursuant to the Clean Water Act. For the reasons discussed below, we affirm.

## I.    BACKGROUND

Lake Sakakawea is a reservoir in North Dakota formed by the enclosure of the Garrison Dam, part of the Missouri River main stem reservoir system established by the Flood Control Act of 1944 ("FCA"). The FCA assigns to the Corps the task of managing the main stem reservoir system. The Corps releases water from Lake Sakakawea into the Missouri River to support downstream navigation in accord with the goals of the FCA.[2]   North Dakota filed suit to enjoin the releases from Lake Sakakawea on the grounds that lowering the level of the lake would violate state-law water-quality standards established pursuant to the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.* ("CWA"). The states of Nebraska and South Dakota also filed complaints as intervenors.

---

[1]The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

[2]For more background on the operation of the Missouri River main stem reservoir system, see our related opinion in *In re: Operation of the Missouri River System Litigation*, Nos. 04-2737/04-2774/04-2785/04-2794/04-2878/04-2994, also released today.

The CWA is a federal law that directs the states to adopt state-law water-quality standards. *Id.* at § 1313. The state water-quality standards must incorporate a designated use for each navigable body of water, as well as water-quality criteria based on the designated use. *Id.* at § 1313(c)(2)(A). "Such standards shall be established taking into consideration their use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes, and also taking into consideration their use and value for navigation." *Id.* Pursuant to the CWA, North Dakota designated Lake Sakakawea as a "cold water fishery," requiring the water to support the growth of salmonid fishes and associated water life. In accord with that designation, North Dakota instituted certain water-quality standards. North Dakota contends that the Corps' releases of water from Lake Sakakawea violate these water-quality standards because they reduce the volume of cold-water habitat in the lake below that needed to support a viable cold-water fishery ecosystem.

The district court dismissed the North Dakota complaint under Fed. R. Civ. P. 12(b)(6), holding that the CWA preserves sovereign immunity from suit for the Corps when the Corps' authority to maintain navigation is at issue. The district court also dismissed the appeals of the intervenors as moot. North Dakota appeals, arguing that the CWA waives the Corps' sovereign immunity in this case.

## II.   DISCUSSION

"We review de novo a district court's order granting a motion to dismiss, viewing the allegations in the complaint in the light most favorable to the plaintiff." *Casazza v. Kiser*, 313 F.3d 414, 418 (8th Cir. 2002). "Like the District Court, we must accept the allegations of the complaint as true and dismiss the case only when 'it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief.'" *Id.* (quoting *Conley v. Gibson*, 355 U.S. 41,

45-46 (1957)).  The district court's interpretation of the CWA is reviewed de novo. *United States v. Templeton*, 378 F.3d 845, 849 (8th Cir. 2004).

North Dakota cannot enforce its state water quality standards against the Corps, a federal agency, unless Congress has unequivocally waived the federal government's sovereign immunity from suit.  *United States Dep't of Energy v. Ohio*, 503 U.S. 607, 615 (1992).  "Waivers of immunity must be construed strictly in favor of the sovereign . . . ."  *Id.* (quotations omitted).  The CWA contains a limited waiver of sovereign immunity:

> Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants . . . shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity . . . .

33 U.S.C. § 1323(a).  This waiver of sovereign immunity is further limited by 33 U.S.C. § 1371(a), which states:  "[The CWA] shall not be construed as . . . affecting or impairing the authority of the Secretary of the Army . . . to maintain navigation."

"Unless exceptional circumstances dictate otherwise, when we find the terms of a statute unambiguous, judicial inquiry is complete."  *Neosho R-V Sch. Dist. v. Clark*, 315 F.3d 1022, 1032 (8th Cir. 2003) (quoting *Burlington N. R.R. v. Okla. Tax Comm'n*, 481 U.S. 454, 461 (1987)).  On its face, § 1371(a) exempts the Corps, which operates under the authority of the Secretary of the Army, from complying with the CWA when its authority to maintain navigation would be affected.  It is also clear from the face of North Dakota's complaint that North Dakota is attempting to use its state water-quality standards to affect the Corps' authority to release water from Lake Sakakawea to support navigation.  There are no exceptional circumstances here to

indicate that Congress would not have intended the § 1371(a) "navigation exception" to the waiver of sovereign immunity to apply in this case.[3]

The CWA was amended in 1977 to emphasize that it applies to discharges from the Corps' channel-dredging operations. North Dakota argues that the legislative history from the 1977 amendment evidences Congress' intent for the Corps to comply with the CWA in all its operations, in spite of the navigation-based limitation in § 1371(a). This argument fails because the 1977 amendment, while emphasizing that the limited waiver of sovereign immunity in § 1323(a) applied to the Corps, left the clearly worded navigation exception in § 1371(a) intact. "Absent some ambiguity in the statute, we have no occasion to look to legislative history." *Clark*, 315 F.3d at 1032. There is nothing ambiguous about the admonition of § 1371(a) that the CWA "shall not be construed as . . . affecting or impairing the authority of the Secretary of

---

[3]The Corps argues that § 1323(a) can be read as not waiving sovereign immunity in this case because the Corps merely is releasing water from the reservoir, not discharging pollutants. Because we find § 1371(a) independently preserves the Corps' sovereign immunity in this case, we do not address the Corps' argument concerning the interpretation of § 1323(a).

We note that in *National Wildlife Federation v. United States Army Corps of Engineers*, 384 F.3d 1163 (9th Cir. 2004), the Ninth Circuit held that § 1323(a) waived sovereign immunity with respect to the Corps' discretionary operation of dams on the Snake River. Nevertheless, the Ninth Circuit held that the CWA could not be enforced against the Corps where state-law water-quality violations were due to "the existence of the dams and not any discretionary method of operating the dams." *Id.* at 1178. The Corps' authority to maintain navigation was not at issue in that case.

the Army . . . to maintain navigation." As a result, we do not reach the legislative history in this case.[4]

_____

[4]In any event, the legislative history from the 1977 amendment would not support North Dakota's argument. The legislative history indicates that Congress' intent in enacting the 1977 amendments was to subject the Corps' *channel-dredging* activities to state water-quality standards promulgated pursuant to the CWA, while preserving its authority to maintain navigation. The relevant passages from the legislative history of the 1977 amendments are as follows:

> The amendment is prompted by varying legal interpretations of the applicability of [CWA] sections 313 [33 U.S.C. § 1323] and 404 [33 U.S.C. § 1344] to dredging activities. In 1975, the U.S. District Court in Minnesota [held] that section 313 and legislative history of the [CWA] required the Corps of Engineers to comply with State water quality standards in dredging activities carried out in the State of Minnesota . . . . This judgment was reversed in 1976 by the Eighth Circuit Court of Appeals, which found that the legislative history of the [CWA] conveyed an intent on the part of Congress to exempt the Corps of Engineers, operating under section 404 [governing permits for dredging], from State environmental law despite the language of section 313. [*Minnesota v. Hoffman*, 543 F.2d 1198 (8th Cir. 1976), *cert. denied*, *Minnesota v. Alexander*, 430 U.S. 977 (1977).]

> By this amendment, the committee clarifies that corps dredging activities are not exempt from State pollution abatement requirements. In spite of language on section 313 in the Senate report on the 1972 act, . . . the Supreme Court ruling in the Minnesota case would otherwise free corps-conducted dredging from compliance with State water quality standards. The intention of the 1972 act was not to exempt the corps or any other public or private agency from State water quality standards and the interpretation of section 404 by the courts is at variance with the intent of Congress. In fact, Congress intended that section 404 in the 1972 act would in its initial implementation end the open water disposal of dredge spoil. Quite the contrary has been the case.

> . . . .

North Dakota also argues that whether compliance with its CWA water-quality standards would affect the Corps' authority to maintain navigation is a factual question. For example, Lake Sakakawea was constructed so that water releases siphon water from near the bottom of the lake. North Dakota suggests that the construction of new outflow structures at Garrison Dam to siphon warmer water from the top of Lake Sakakawea, rather than colder water from the bottom, might allow the Corps to comply with North Dakota's water-quality standards for a cold-water fishery while still providing the requisite water releases to maintain navigation. If we allowed North Dakota to enforce its water-quality standards on this basis, there is no discernible limit to the new structures and new operational plans that other states with main-stem reservoirs could demand to force the Corps to comply with their own water-quality standards. If each state is allowed to use its reservoir water-quality standards as a tool to control how the Corps must release water from the main stem reservoirs, the "authority of the Secretary of the Army . . . to maintain navigation" will obviously be affected, in violation of § 1371(a).

As the district court noted, the above result is also supported by the principles of preemption. Implied conflict preemption arises "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Nordgren v. Burlington N. R.R. Co.*, 101 F.3d 1246, 1248 (8th Cir. 1996) (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (internal citations omitted)). "In determining whether state law 'stands as an obstacle' to the full implementation of a federal law, 'it is not enough to say that the ultimate goal of both federal and state law' is the same." *Forest Park II v. Hadley*, 336 F.3d 724, 733 (8th Cir. 2003) (quoting *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987)). "A state law also is pre-empted if it interferes with the methods by which the federal statute

---

This amendment to section 404 is neither intended nor expected to result in compromising the ability of the corps to maintain navigation.

S. Rep. No. 95-370, at 68-69 (1977), reprinted in 1977 U.S.C.C.A.N. 4326, 4393 - 94.

was designed to reach that goal." *Id.* (quoting *Int'l Paper Co.*, 479 U.S. at 494). "Thus, 'where a state statute conflicts with, or frustrates, federal law, the former must give way.'" *Id.* (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663 (1993)).

Congress established the goals for the Missouri River main stem reservoir system in the FCA. The dominant functions of the project are flood control and downstream navigation, and secondary interests include irrigation, recreation, fish and wildlife. *South Dakota v. Ubbelohde*, 330 F.3d 1014, 1019-20 (8th Cir. 2003). Congress also set forth the method by which the federal statute was designed to reach those goals—the FCA vests the Corps with the duty to balance navigation with other water-use interests, including the interests of the reservoir states. *Ubbelohde*, 330 F.3d at 1027. Allowing individual states to use their water-quality standards to control how the Corps balances water-use interests would frustrate the design of the FCA. Accordingly, the enforcement of state water-quality standards against the Corps' release of water from Lake Sakakawea is preempted.

The CWA's preservation of sovereign immunity where the Corps' authority to maintain navigation would be affected and the principles of preemption preclude the enforcement of North Dakota's state water-quality standards against the Corps' releases of water from Lake Sakakawea. Therefore, the district court did not err in dismissing North Dakota's complaint.

## III. CONCLUSION

For the reasons discussed above, we affirm the dismissal of North Dakota's complaint.

_____