# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-1325

_____

Contemporary Industries Corporation,   *
doing business as Contemporary   *
Industries Mid-America, Inc., doing   *
business as Contemporary Industries   *
Southern, Inc.; Official Committee of   *
Unsecured Creditors of CIC,   *
  *
        Appellants,   *
  *   Appeal from the United States
     v.   *   District Court for the
  *   District of Nebraska.
Terry G. Frost; M. Sue Schmidt,   *
in her capacity as Trustee of the -   *
Erik N. Frost Irrevocable Trust -   *
Brett R. Frost Irrevocable Trust -   *
Erik N. Frost Irrevocable (QSST)   *
Trust - Brett R. Frost Irrevocable   *
(QSST) Trust; Nancy A. Kuhl;   *
Daniel J. Kuhl; David T. Cap;   *
Susan A. Cap,   *
  *
        Appellees.   *

_____

Submitted: November 14, 2008
Filed: April 29, 2009

_____

Before WOLLMAN, BEAM, and BENTON, Circuit Judges.

_____

BEAM, Circuit Judge.

Contemporary Industries Corporation (individually, "Contemporary Industries") and the Official Committee of Unsecured Creditors of CIC (collectively with Contemporary Industries, "CIC") appeal from a grant of summary judgment in favor of the former shareholders of Contemporary Industries. CIC seeks to avoid payments made to those shareholders in exchange for their Contemporary Industries stock during a leveraged buyout of the corporation. The bankruptcy court[1] concluded, and the district court[2] agreed, the payments were exempt from avoidance as settlement payments within the meaning of a former version of 11 U.S.C. § 546(e) of the Bankruptcy Code. For the reasons set forth herein, we affirm.

## I.    BACKGROUND

Put simply, the material facts are as follows: defendants Terry Frost, David and Nancy Kuhl, David and Susan Cap, and various Frost family trusts (collectively, "the Frosts"), are the former shareholders of Contemporary Industries, a privately-held Nevada corporation headquartered in Omaha, Nebraska. By late 1995, Contemporary Industries operated 146 convenience stores throughout the Midwest. In December 1995, the Frosts sold their shares to an outside investment group. To facilitate the acquisition, the investment group set up a new corporation, Contemporary Industries Holding (CIH). The investors then obtained significant loans to cover the purchase price of the shares, and pledged Contemporary Industries' assets to the lenders as collateral. Ultimately, CIH deposited approximately $26.5 million with First National Bank of Omaha (First National), and the Frosts deposited their shares with First National. The parties entered into an escrow agreement regarding the distribution of the purchase price funds to the Frosts.

---

[1]The Honorable Timothy J. Mahoney, United States Bankruptcy Judge for the Bankruptcy Court of the District of Nebraska.

[2]The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska.

In February 1998, Contemporary Industries filed a voluntary Chapter 11 bankruptcy petition, which CIC now suggests was a direct consequence of the debt load undertaken by the corporation in the leveraged buyout. In late 1999, CIC instituted this adversary proceeding, seeking to recover the payments the Frosts received in exchange for their stock during the leveraged buyout (hereinafter, "the payments"). The complaint alleged that the payments were fraudulent transfers avoidable under 11 U.S.C. § 544 and certain provisions of the Nebraska Uniform Fraudulent Transfer Act. The complaint also alleged that the Frosts were unjustly enriched by the payments and that the payments amounted to excessive and/or illegal shareholder distributions, in violation of applicable non-bankruptcy law.

The Frosts moved for summary judgment, asserting that the payments were exempt from avoidance under § 546(e), the applicable version of which immunized from avoidance all "transfer[s] that [are] . . . settlement payment[s] . . . made by or to a . . . financial institution." 11 U.S.C. § 546(e) (1999). The bankruptcy court agreed and further concluded CIC's claims for unjust enrichment and illegal/excessive distributions were preempted, inasmuch as those claims sought essentially the same relief as the avoidance claims barred by § 546(e). The bankruptcy court therefore granted summary judgment to the Frosts on all claims. The district court affirmed.

## II.   DISCUSSION

### A.   Standard of Review

We review the bankruptcy court's grant of summary judgment de novo, applying the same standards as the district court. Tudor Oaks Ltd. P'ship v. Cochrane (In re Cochrane), 124 F.3d 978, 981 (8th Cir. 1997). Thus, we will affirm if, after giving the non-moving party the benefit of all reasonable inferences, "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Id.

-3-

**B.     The § 546(e) Exemption**

Section 546(e) of the Bankruptcy Code provides an exception to various other Code provisions that allow a trustee or debtor-in-possession to avoid certain transfers made by the debtor before the bankruptcy case is filed.  When this action was commenced in late 1999, that section stated, in pertinent part:

> Notwithstanding section[] 544 . . . of this title, *the trustee may not avoid a transfer that is a . . . settlement payment*, as defined in section . . . 741 of this title,  *made by or to a . . . financial institution, . . .* that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.[3]

11 U.S.C. § 546(e) (1999)[4] (emphases added).  The Frosts contend on appeal, and the bankruptcy and district courts held, that the payments they received in exchange for their privately-held Contemporary Industries stock are exempt from avoidance within the plain meaning of the italicized language.  CIC contends, however, that the payments are not settlement payments within the meaning of § 546(e), because that section was enacted to protect the stability of the financial markets and only protects payments made to settle public securities transactions.  CIC also contends the payments were not "made by or to a . . . financial institution" within the meaning of § 546(e), because First National never obtained a beneficial interest in the funds.

---

[3]Section 548(a)(1)(A) allows for the avoidance of certain transfers that were made before the bankruptcy filing, if made with "actual intent to hinder, delay, or defraud [creditors]."  11 U.S.C. § 548(a)(1)(A).

[4]The statute has been amended several times since, most recently by the Financial Netting Improvements Act of 2006, Pub. L. 109-390, 120 Stat. 2692.

To resolve these questions of statutory interpretation, we begin, as always, by looking to the relevant statutory text. Lamie v. United States Trustee, 540 U.S. 526, 534 (2004). Where statutory language is plain, "the sole function of the courts–at least where the disposition required by the text is not absurd–is to enforce it according to its terms." Id. (quotation omitted). Thus, if the relevant text is not reasonably susceptible to more than one interpretation, we will not look beyond it unless application of the plain language "will produce a result demonstrably at odds with the intentions of its drafters." United States v. Ron Pair Enters., 489 U.S. 235, 242 (1989) (quotation omitted).

With those principles in mind, we first consider whether the payments at issue are settlement payments within the meaning of § 546(e). A "settlement payment," for these purposes, is defined as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." 11 U.S.C. § 741(8). We have not had an occasion to consider whether payments for privately-held securities fall within that definition. Three of our sister circuits have concluded, however, that § 741(8) is "extremely broad" and intended to encompass most payments that can be considered settlement payments. Kaiser Steel Corp. v. Charles Schwab & Co., 913 F.2d 846, 848 (10th Cir. 1990) (quotation omitted). Accord Lowenschuss v. Resorts Int'l, Inc. (In re Resorts, Int'l, Inc.), 181 F.3d 505, 514-15 (3d Cir. 1999); Jonas v. Resolution Trust Corp. (In re Comark), 971 F.2d 322, 326 (9th Cir. 1992). And as the concluding phrase in § 741(8) suggests, that term is one of art in the securities trade and should be given its established meaning in that industry. See McDermott Int'l, Inc. v. Wilander, 498 U.S. 337, 342-46 (1991). Specifically, "settlement" refers to "the completion of a securities transaction," Kaiser Steel Corp., 913 F.2d at 849 (quotation omitted) (citing various securities industry reference materials), and a "settlement payment is generally the transfer of cash or securities made to complete [the] securities transaction." In re Resorts, Int'l, Inc., 181 F.3d at 515 (citing Kaiser Steel Corp., 913 F.2d at 849).

After construing § 741(8) broadly, both the Third and Tenth Circuits have concluded payments made to selling shareholders in the course of a leveraged buyout qualify as settlement payments within the plain meaning of § 546(e). Id. at 515-16; Kaiser Steel Corp. v. Pearl Brewing Co. (In re Kaiser Steel Corp.), 952 F.2d 1230, 1238-40 (10th Cir. 1991). CIC would distinguish Resorts and Kaiser on the ground that both involved publicly traded securities and points out that several courts have concluded the statutory definition of settlement payment does not encompass payments for privately held securities. See, e.g., Official Comm. of Unsecured Creditors v. Lattman (In re Norstan Apparel Shops, Inc.), 367 B.R. 68, 76-77 (Bankr. E.D.N.Y. 2007); Official Comm. of Unsecured Creditors v. Asea Brown Boveri, Inc. (In re Grand Eagle Co.), 288 B.R. 484, 494 (Bankr. N.D. Ohio 2003); see also Kipperman v. Circle Trust F.B.O. (In re Grafton Partners, L.P.), 321 B.R. 527, 539-40 (B.A.P. 9th Cir. 2005). The general rationale behind those holdings, which rely in part on legislative history, is that § 546(e) was enacted to protect the nation's financial markets against instability caused by the reversal of settled securities transactions, that undoing private transactions does not implicate those concerns, and therefore, that Congress did not intend for payments like the ones at issue to fall within the purview of the exemption. See, e.g., In re Norstan Apparel Shops, Inc., 367 B.R. at 76 (concluding that "in the context of the legislative history . . . [and to avoid absurd results], the modifying phrase [securities trade] at the end of § 741(8) must be understood . . . to mean that in order to be encompassed in the statutory definition of 'settlement payment,' a transaction must involve the public securities markets."); see also In re Grand Eagle, 288 B.R. at 491-94. CIC suggests we should also review legislative history to determine whether these payments qualify as settlement payments, either because § 741(8)'s definition of that term is ambiguous or because extending § 546(e)'s protection to these payments would lead to an absurd result.

As noted above, however, our analysis begins–and where the language is plain, usually ends–with the statutory text. Lamie, 540 U.S. at 534. Here, the relevant text has a sufficiently plain and unambiguous meaning. We agree with our sister circuits that § 741(8) was intended to sweep broadly. In re Resorts, Int'l, Inc., 181 F.3d at

515-16; In re Comark, 971 F.2d at 326; Kaiser Steel Corp., 913 F.2d at 848-49. Thus, we conclude the term "settlement payment," as used therein, encompasses most transfers of money or securities made to complete a securities transaction. See In re Resorts, Int'l, Inc., 181 F.3d at 515-16. That is exactly what we have before us: the payments at issue were transfers of money made to complete a securities transaction, namely, the sale of the Frosts' Contemporary Industries stock. Nothing in the relevant statutory language suggests Congress intended to exclude these payments from the statutory definition of "settlement payment" simply because the stock at issue was privately held. Section 741(8) is certainly not expressly limited to public securities transactions, and neither is § 546(e). Similarly, we do not believe § 741(8)'s concluding phrase "or any other similar payment commonly used in the securities trade" evinces an intent to exclude payments for privately held stock. To the contrary, the phrase follows a long list of various kinds of settlement payments and so we think it is most naturally read as a catchall phrase intended to underscore the *breadth* of the § 546(e) exemption. See QSI Holdings, Inc. v. Alford, 382 B.R. 731, 741 (W.D. Mich. 2007). For these reasons, we conclude the payments at issue are settlement payments within the plain meaning of § 546(e) and § 741(8). Accord e.g., id. at 741-42 (concluding similar payments made to selling shareholders in exchange for privately held stock were settlement payments within the plain meaning of those sections).

We further conclude the payments were made "by or to a . . . financial institution" within the plain meaning of § 546(e). As noted above, CIC contends this requirement is not satisfied because First National never obtained a beneficial interest in the payments made to the Frosts. We recognize that a divided panel of the Eleventh Circuit adopted this argument in refusing to apply § 546(e) to protect similar payments made to selling shareholders in the course of a leveraged buyout. Munford v. Valuation Research Corp. (In re Munford, Inc.), 98 F.3d 604, 610 (11th Cir. 1996) (per curiam). Because the bank never obtained a beneficial interest in the funds, the Munford majority concluded the bank "was not a 'transferee' in the LBO transaction." Id. Instead, the majority reasoned that the payments were really made "*by* Munford

*to* shareholders," and the bank merely acted as a conduit for the payments. Id. Thus, the majority concluded § 546(e) was inapplicable because the transaction did not involve an actual transfer of beneficial interest by or to the financial institution involved. Id. We agree with the Third Circuit, however, that the holding in Munford cannot be squared with § 546(e)'s plain language. In re Resorts, Int'l, Inc., 181 F.3d at 516; see also In re Munford, 98 F.3d at 613-14 (Hatchett, C.J., dissenting in part). By its terms, § 546(e) protects settlement payments "made by or to a . . . financial institution," and does not expressly require that the financial institution obtain a beneficial interest in the funds.  We have already decided the payments at issue are settlement payments, and First National, a bank, is a financial institution.  In re Resorts, Int'l, Inc., 181 F.3d at 515.  Similarly, it is undisputed that First National received the payments from CIH and then distributed the payments to the Frosts in exchange for their stock.  Thus, the settlement payments at issue were first made to, and then by, a financial institution.  Under a literal reading of the relevant statutory language, the payments satisfy both requirements necessary to invoke the protections of § 546(e). Accord id. at 515-16.

Where statutory language is plain and does not lead to an absurd result, we must enforce it as written. See Lamie, 540 U.S. at 534.  There is no reason to depart from that rule here.  For the reasons discussed, the relevant text is not reasonably susceptible to the interpretation advanced by CIC–rather, the text plainly and unambiguously encompasses these payments. Moreover, that plain language does not lead to an absurd result in this case.  CIC disagrees and contends it is unreasonable to construe § 546(e) as exempting these payments, the reversal of which would in no way impact the stability of the financial markets, solely because the parties utilized a financial institution as an escrow agent to complete the transaction.  CIC argues that although it would have been unreasonable to expect the parties to assemble $26.5 million in cash for the closing, the payments would fall outside the exemption's scope if they had done so.  We see no absurdity in that result.  Indeed, particularly because so much money is at stake, we question CIC's assertion that the reversal of the payments–at least a portion of which were probably reinvested–would in no way

impact the nation's financial markets.  At the very least, we can see how Congress might have believed undoing similar transactions *could* impact those markets, and why Congress might have thought it prudent to extend protection to payments such as these.  See QSI Holdings, 382 B.R. at 735, 742 (rejecting a similar argument in a case where the private transaction sought to be avoided involved the distribution of approximately \$200 million in cash and stock to the selling shareholders).[5]  In sum, this is not one of those "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters," Ron Pair Enters., 489 U.S. at 242 (alteration in original) (quotation omitted), and the plain language therefore controls.  Applying that language, we conclude the payments made to the Frosts in exchange for their Contemporary Industries stock are exempt from avoidance in bankruptcy as "settlement payment[s] . . . made by or to a . . . financial institution."  11 U.S.C. § 546(e) (1999).

---

[5]We also do not believe, as CIC suggests, that our interpretation paves the way for widespread abuse of the § 546(e) exemption by encouraging savvy investors and counsel to funnel any and all payments for stock through banks and to thereby immunize the payments from later avoidance in bankruptcy.  Rather, we agree with another court's recent assessment of that argument: "[where] such abuse seems evident, a statutory safety valve exists. . . . [B]y definition, a settlement payment must be commonly used in the securities trade . . . [and it is] unlikely that a transaction that is a clear abuse of the exemption could be said to be commonly used in [that] trade." QSI Holdings, Inc., 382 B.R. at 743 (internal citation omitted).

## C.    State Law Claims

CIC also contends the bankruptcy court erred in concluding its state law claims for unjust enrichment and illegal and/or excessive shareholder distributions are preempted by § 546(e). We conclude the bankruptcy court properly granted summary judgment to the Frosts on these claims as well.

Pursuant to the Supremacy Clause of the Constitution, federal law trumps state law "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." North Dakota v. U.S. Dep't of the Army (In re Operation of the Mo. River Sys. Litig.), 418 F.3d 915, 919 (8th Cir. 2005) (quotation omitted). Thus, to the extent state laws "conflict[] with, or frustrate[], federal law, the former must give way." Id. (quotation omitted). Such is the case here. Through its state law claims, CIC seeks to recover the same payments we have already held are unavoidable under § 546(e). Allowing recovery on these claims would render the § 546(e) exemption meaningless, and would wholly frustrate the purpose behind that section. Thus, CIC's state law claims must fail. Accord Official Comm. of Unsecured Creditors of Hechinger Inv. Co. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co.), 274 B.R. 71, 96 (D. Del. 2002).

CIC's arguments to the contrary do not convince us otherwise. Citing Enron Corp. v. Bear, Stearns International Limited (In re Enron Corp.), 323 B.R. 857 (Bankr. S.D.N.Y. 2005), CIC argues that an illegal distribution does not qualify as a settlement payment and thus § 546(e) does not preempt state law claims that "are based on a clear statutory violation." Appellants' Brief at 56-57. In fact, the holding in Enron is much narrower, and inapplicable. In Enron, a debtor corporation sought to avoid payments it had made to recover its own stock as fraudulent transfers and under an unjust enrichment theory, alleging that the payments violated an Oregon shareholder distribution statute. 323 B.R. at 862-63, 870. Because acts done in violation of the statute were void under Oregon law, the court concluded the underlying transaction would be a nullity if it actually violated the statute. Id. at 876. And if the transaction

was a nullity, the court reasoned that no settlement payment could have resulted, because "[a] settlement payment is a payment made to discharge a settlement obligation," and no party has any obligations under a void agreement. Id. Thus, the court declined to dismiss the debtor's claims as barred by § 546(e), because it was possible the transaction did not result in *any* settlement payment to which that section could apply. Id. at 877-79. As the court specifically pointed out, however, its narrow holding turned on the fact that Oregon follows the minority rule that unlawful distributions are void, and not merely voidable. Id. at 878. Unlike void transactions, the court noted, *voidable* transactions are valid until annulled; thus, a voidable securities transaction creates an enforceable settlement obligation and could result in a settlement payment entitled to § 546(e) protection. Id. at 877-78. As CIC cites no authority indicating Nevada[6] would consider the transaction at issue void, the Enron holding provides no support for CIC's position.[7]

## III. CONCLUSION

In sum, we conclude the payments the Frosts received in exchange for their privately held Contemporary Industries stock are exempt settlement payments within the meaning of former 11 U.S.C. § 546(e). As such, the payments can neither be avoided as fraudulent transfers, nor recovered under theories of unjust enrichment or

---

[6]The parties agree that Nevada law governs these claims.

[7]CIC's reliance on In re Grafton Partners, 321 B.R. 527, is similarly unavailing. In Grafton, the Ninth Circuit Bankruptcy Appellate Panel concluded that a non-public transaction in illegally unregistered securities could not give rise to a settlement payment "commonly used in the securities trade," and thus entitled to protection under § 546(e). Id. at 529. The court's holding turned largely on the fact the underlying transaction (which occurred in the context of a Ponzi scheme) "was so steeped in fraud that [it] could not be normally regarded as part of the settlement process." Id. at 530, 540 (internal quotation omitted). Thus, Grafton is clearly distinguishable.

illegal and/or excessive shareholder distributions.  For these reasons, we affirm the grant of summary judgment in favor of the Frosts on all claims.

_____